**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| JONATHAN H., on his own behalf and on behalf of his minor child, J.H., <br><br> Plaintiffs, <br><br> v. <br><br> HIGHLINE PUBLIC SCHOOLS; LORI McEWEN, individually and in her official capacity as Vice Principal at Sylvester Middle School, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

Civil Action No.:

**COMPLAINT FOR DAMAGES, INJUNCTION, DECLARATORY RELIEF, AND ATTORNEYS' FEES FOR VIOLATION OF CIVIL RIGHTS**

**JURY TRIAL DEMANDED**

**COMPLAINT**

1. Plaintiff, Jonathan H., on his own behalf and on behalf of his minor child, J.H., brings this action for declaratory, compensatory, and injunctive relief to vindicate the constitutional and civil rights of both J.H. and himself.

2. Defendant Highline Public Schools ("the District") has violated, and continues to violate, J.H.'s and Jonathan H.'s constitutional rights, first by prohibiting her from quietly distributing Christian gospel tracts and discussing her faith with willing classmates during non-

COMPLAINT - Page 1

AMERICAN CENTER FOR LAW & JUSTICE
201 Maryland Ave NE
Washington DC, 20002
(202) 546-8890

instructional time at Sylvester Middle School, and then by forcing her to sit through a mandatory assembly that instructed students on a "moral standard" which directly conflicted with her and her parents' fundamental religious beliefs despite her objections—and by overriding Jonathan H.'s right to direct the religious and moral upbringing of his child.

3. This action is brought pursuant to 42 U.S.C. § 1983. The District's policies and practices have deprived and continue to deprive J.H. and her father of rights guaranteed by the First and Fourteenth Amendments to the United States Constitution and by the Washington Constitution.

## I.   NATURE OF THE CASE

4. Acting out of sincere Christian conviction, J.H. distributes gospel tracts to fellow students during non-instructional periods, always first asking for each student's consent before offering a tract, and never persisting with any student who declines.

5. On or about February 18, 2026, Defendant Vice Principal Lori McEwen removed J.H. from her math class and informed her that she was not permitted to distribute religious gospel tracts at school.

6. When J.H. asked why other students were free to share their viewpoints while she was not, McEwen made a statement of remarkable unconstitutional candor: she told J.H. that students may share opinions, but they may not share religious beliefs.

7. When J.H. asked why students could participate in an ICE protest but she could not pass out tracts, McEwen responded that the ICE protests were permissible because they constituted an "opinion."

8. This is a paradigmatic case of viewpoint discrimination, the most egregious and constitutionally suspect form of a content-based speech restriction.

9. What makes this case particularly egregious is that Defendants are repeating a constitutional violation for which they have already been called to account and which they formally promised to correct.

COMPLAINT - Page 2

10. Several years ago, when J.H. was a second-grade student at North Hill Elementary School, also within the Highline Public Schools District, school officials engaged in a strikingly similar suppression of her religious expression, including searching her backpack on multiple occasions to confiscate religious materials and sending her to the principal's office more than ten times for exercising her First Amendment rights during recess.

11. The District's pattern of disregard for J.H.'s religious liberty has since escalated a third time; the District has adopted a pattern and practice of targeting J.H. for her religious speech.

12. On May 29, 2026, Sylvester Middle School compelled J.H.—along with the entire student body—to attend a mandatory, school-wide "Inclusion Assembly" containing extensive content regarding sexual orientation and gender identity that directly conflicted with J.H.'s sincerely held religious beliefs.

13. When J.H. expressed her religious discomfort and asked to be excused, a teacher expressly told her "you have no choice" but to remain, and J.H. was compelled to sit through the remainder of the assembly in tears, regardless of her sincere religious request to be excused.

14. The District's own slides displayed at the assembly confirm that this was not neutral exposure to information. The presentation expressly instructed students that supporting the LGBTQIA+ community meant "creating a moral standard" in the school community and "putting people on notice" that contrary treatment would not be allowed.

15. By framing the issue in expressly moral terms, the District placed its own preferred moral judgment before a captive student audience, directly intruding on the J.H. family's religious authority to teach J.H. their own moral and spiritual beliefs regarding sexuality and gender.

16. Neither J.H. nor her parents received advance notice of the assembly's content or any opportunity to opt out, in contrast to the District's own prior practice of providing such notice.

17. The violation of a student's First Amendment rights, even for a brief period, constitutes irreparable harm.

18. Plaintiffs therefore seek declaratory and injunctive relief compelling the District to

COMPLAINT - Page 3

AMERICAN CENTER FOR LAW & JUSTICE
201 Maryland Ave NE
Washington DC, 20002
(202) 546-8890

immediately restore J.H.'s right to distribute religious tracts and discuss her faith during non-instructional time, to refrain from compelling J.H.'s attendance at future programming that conflicts with the family's sincerely held religious beliefs absent advance notice to J.H. and her parents and a meaningful opportunity to opt out, as well as compensatory damages and attorneys' fees for the District's ongoing violation of Plaintiffs' constitutional rights.

## II.    PARTIES

19.    Plaintiff Jonathan H. is the father of J.H. He currently is, and at all relevant times was, a citizen of the United States and resident of King County, Washington, within the Highline Public Schools District.

20.    Plaintiff Jonathan H. also brings this action on behalf of his minor child, J.H., who is presently a student enrolled at Sylvester Middle School in the Highline Public Schools District.

21.    Defendant Highline Public Schools ("the District") is a public school district organized and existing under the laws of the State of Washington. The District operates Sylvester Middle School, among other schools.

22.    Defendant Lori McEwen is the Vice Principal of Sylvester Middle School, a school within the Highline Public Schools District.

23.    At all times relevant to this Complaint, McEwen acted in her official capacity as Vice Principal and under color of state law.

24.    McEwen is sued in her individual and official capacities.

25.    McEwen is the same Vice Principal who, on February 18, 2026, removed J.H. from class and prohibited her from distributing religious materials, and who was present in the gymnasium and observed the proceedings during the May 29, 2026, Inclusion Assembly described below.

26.    As Vice Principal, McEwen possesses policymaking authority over student discipline, the enforcement of student-expression rules, and the supervision of school assemblies and other student programming at Sylvester Middle School, such that her acts and omissions

COMPLAINT - Page 4

AMERICAN CENTER FOR LAW & JUSTICE
201 Maryland Ave NE
Washington DC, 20002
(202) 546-8890

described herein constitute the official policy and custom of the District for purposes of municipal liability under 42 U.S.C. § 1983.

27.   In the alternative, and independent of McEwen's own policymaking authority, Superintendent Dr. Ivan Duran and the Highline Public Schools Board of Directors are the District's final policymakers with authority over District-wide policy, including the policies governing student religious expression, mandatory assemblies, and the District's response to known constitutional violations.

28.   The Superintendent and Board were actually made aware of McEwen's conduct toward J.H., and of the conduct described in connection with the May 29, 2026, Inclusion Assembly, through Plaintiff's first, second, and third demand letters (Exhibits A, C, and E), each of which was directed to the Superintendent.

29.   By declining to repudiate, correct, or meaningfully investigate this conduct after being placed on actual notice on three separate occasions, the Superintendent and Board ratified McEwen's conduct and the conduct of the staff involved in the Inclusion Assembly as official District policy, practice, and custom.

**III.   JURISDICTION AND VENUE**

30.   This civil rights action raises federal questions under the United States Constitution, particularly the First Amendment, as enforceable by 42 U.S.C. § 1983.

31.   This Court has original jurisdiction over these federal claims pursuant to 28 U.S.C. §§ 1331 and 1343.

32.   This Court has authority to award the requested damages pursuant to 28 U.S.C. § 1343; the requested declaratory relief pursuant to 28 U.S.C. §§ 2201–02; the requested injunctive relief pursuant to 28 U.S.C. § 1343 and Fed. R. Civ. P. 65; and costs and attorneys' fees under 42 U.S.C. § 1988.

33.   This Court's supplemental jurisdiction over Plaintiffs' claims under Washington law is proper pursuant to 28 U.S.C. § 1367, as those claims arise from the same nucleus of

AMERICAN CENTER FOR LAW & JUSTICE
201 Maryland Ave NE
Washington DC, 20002
(202) 546-8890

operative facts.

34.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), because Defendants reside in this district and division and/or all the acts described in this Complaint occurred within this district.

IV.    FACTUAL ALLEGATIONS

a.    J.H.'s Student-Initiated Religious Expression and Religious Belief

35.    J.H. is a student enrolled at Sylvester Middle School, a public middle school in the Highline Public Schools District located in King County, Washington.

36.    J.H. and her family are devout Christians. For several years, as an expression of her sincerely held religious beliefs, J.H. has engaged in student-initiated religious expression during non-instructional time at school.

37.    Specifically, J.H. distributes Christian gospel tracts to fellow students during non-instructional periods such as breaks and lunch.

38.    J.H. is careful and respectful in how she conducts this expression.

39.    She always asks each student for consent before offering a tract, and she does not impose materials on any student who does not wish to receive them.

40.    J.H. also talks about her faith with interested classmates during non-instructional time, including discussing God and her religious beliefs with students who consent to speak with her about such matters.

b.    Jonathan H.'s Religious Belief

41.    Jonathan H., J.H.'s father, is a practicing Christian whose sincerely held religious beliefs require that he, not the State, direct the moral and spiritual formation of his child.

42.    Jonathan H.'s Christian faith is grounded in Biblical teachings that marriage is a sacred union between one man and one woman, as ordained by God.

43.    Plaintiff believes he has a religious duty to teach his child these principles and that the child's exposure to curriculum normalizing LGBTQ+ relationships and conduct directly

COMPLAINT - Page 6

AMERICAN CENTER FOR LAW & JUSTICE
201 Maryland Ave NE
Washington DC, 20002
(202) 546-8890

undermines his ability to provide religious instruction during this critical formative period.

44.     Plaintiff's faith teaches that parents, not the State, are entrusted by God with the primary responsibility for their children's moral and spiritual formation.

45.     These beliefs include the conviction that God created human beings male and female, that a person's sex is a God-given reality rather than a matter of personal self-definition, and that human sexuality is properly ordered within the covenant of marriage between one man and one woman.

46.     The H. family's Christian faith therefore teaches that messages affirming or celebrating contrary understandings of sexuality, gender identity, and gender expression conflict with the religious instruction they seek to provide J.H.

47.     The H. family also believes that parents have a religious obligation to guard their child's conscience and to decide when and how sensitive moral and religious subjects are introduced to her.

48.     Consistent with these beliefs, Jonathan H. seeks to raise J.H. to treat all people with dignity and respect while also remaining faithful to Biblical teachings on sexuality, marriage, gender, and conscience.

49.     Compulsory school-sponsored instruction urging J.H. to adopt, affirm, or celebrate a contrary moral framework substantially interferes with that religious responsibility.

**c.     The First Incident at North Hill Elementary School**

50.     The first incident arose several years earlier while J.H. was a second-grade student at North Hill Elementary School, also within the Highline Public Schools District.

51.     In January 2022, school officials at North Hill Elementary, including Principal Kimberly Jones, prohibited J.H. from distributing religious tracts and crosses to her classmates, searched J.H.'s backpack on multiple occasions to confiscate religious materials, and sent J.H. to the Principal's office at least ten times for exercising her First Amendment rights during recess.

52.     On February 14, 2022, Plaintiff's counsel sent a demand letter to the Superintendent

COMPLAINT - Page 7

AMERICAN CENTER FOR LAW & JUSTICE
201 Maryland Ave NE
Washington DC, 20002
(202) 546-8890

of Highline Public Schools on behalf of J.H. and her family (attached hereto as Exhibit A), setting forth the applicable law and demanding that the District cease its violation of J.H.'s First Amendment rights.

53. In a public statement, the District complained about J.H.'s religious expression as offensive for distributing "unacceptable religious materials," stating, "This came after several students reported being scared by her talk of Satan and Hell, and multiple parents complained about their children coming home with religious pamphlets."[1]

54. On March 8, 2022, the District responded through Holly Ferguson, J.D., its Chief Policy and Strategy Officer. In that written response (attached hereto as Exhibit B), the District formally agreed that it would allow J.H. "to distribute materials at school going forward, including religious materials."

55. The District expressly agreed with the principles set forth in Plaintiff's counsel's letter, including "government neutrality to religion, avoidance of discrimination against religious viewpoints, and allowing students to express themselves at school, including potentially through the distribution of religious materials."

**d.      The Second Incident at Sylvester Middle School**

56. On or about February 18, 2026, J.H. was attending her math class at Sylvester Middle School when McEwen entered the classroom, removed J.H. from class, and confronted her about her religious expression.

57. McEwen told J.H. that she was not permitted to distribute religious gospel tracts at school.

58. When J.H. asked why other students are allowed to express their viewpoints while she is not, McEwen drew an explicit and constitutionally impermissible distinction: she told J.H. that students may share opinions, but they may not share religious beliefs.

---

[1] https://cbn.com/news/news/wa-school-officials-reprimand-2nd-grader-and-search-her-backpack-after-she-shared-her.

COMPLAINT - Page 8

59.     J.H. specifically asked McEwen why students were permitted to leave campus during school hours to participate in anti-ICE protests.

60.     J.H. was referencing a recent incident in which the teachers allowed and escorted students off campus to protest ICE.

61.     During this ICE protest, the teachers and students marched several blocks over to the nearby CVS store.  Some of the children went inside for a little while until they were told to leave.  Some teachers entered the store with the students, while others remained outside. The children then returned to school with the teachers.

62.     McEwen responded that these protests constituted permissible student opinion and expression, while simultaneously maintaining that J.H.'s distribution of religious literature is not permitted.

63.     The statements made by McEwen make plain that the District is applying a double standard: secular political expression is welcomed and facilitated by the school, while religious expression is singled out for prohibition.

64.     During the same encounter, J.H. asked whether she could form and operate a Christian student club. McEwen told her that she could do so, but that any such club would be required to obtain a teacher sponsor.

65.     This statement misrepresents the applicable legal and policy framework. The Equal Access Act, 20 U.S.C. § 4071(c)(3), provides that school employees may be present at student religious group meetings only in a non-participatory, custodial capacity and the school may not require a teacher to sponsor or endorse a religious group as a precondition of its recognition.

66.     Moreover, the District's own student activities policy, Policy 2153,[2] places no obligation on students to recruit a willing teacher sponsor. Rather, it provides that the principal shall assign a faculty monitor where one is needed, stating: "The principal shall be responsible for

---

[2] Policy 2153 – Non-Curriculum-Related-Student-Groups, HIGHLINE PUB. SCH.,
https://www.highlineschools.org/about/board-policies/policy-details/~board/board-policies/post/policy-2153-non-curriculum-related-student-groups

COMPLAINT - Page 9

the assignment of a room and for the approval and/or assignment of a staff member to monitor the meeting."

67.    The ACLJ sent a second demand letter to Superintendent Dr. Ivan Duran of Highline Public Schools on March 20, 2026 (attached hereto as Exhibit C), demanding immediate written assurances that the District comply with the First Amendment by permitting J.H. to distribute her religious tracts and discuss her faith during non-instructional time, and confirming J.H.'s right to form a Christian student club on equal terms with other non-curriculum-related student groups.

68.    The demand letter set a deadline of March 27, 2026, for the District's response.

**e.    The District's March 27, 2026, Response**

69.    On the deadline for responding, March 27, 2026, the School District provided a response through Holly Ferguson, J.D., its Chief Policy and Strategy Officer. In that written response (attached hereto as Exhibit D), the District acknowledged that "J.H. was distributing religious tracts before school in the cafeteria, which is permitted."

70.    It claimed, however, that Vice Principal McEwen had only "entered the classroom to confirm that J.H. knew that distribution during class is not permitted."

71.    The letter did not explain why, according to the District's own account, a Vice Principal would have pulled a student out of class to confront her over a rule the District did not claim she had violated.

72.    The letter did acknowledge that "J.H. may certainly distribute her materials during non-instructional times such as before and after school and during lunch."

73.    The District's response did not provide the written assurances requested. Instead, the District characterized Vice Principal McEwen's conduct as enforcement of a generally applicable rule against distributing personal materials during class, rather than as viewpoint discrimination.

74.    The District further represented that staff sponsors of student clubs, including any

COMPLAINT - Page 10

religious club, serve only in a "non-participatory, custodial capacity," but did not withdraw its position that J.H. must independently "follow the school's process" to form a club, without identifying what that process requires or confirming that it would not impose burdens beyond those imposed on other non-curriculum-related student groups.

75.    The District's March 27, 2026, response did not contradict Plaintiff's account of when J.H. distributed her tracts.

76.    Nor does the District's response dispute, deny, or even address McEwen's statement to J.H. that students may share opinions but may not share religious beliefs, or McEwen's express distinction between permitted political protest and prohibited religious expression—the core viewpoint-discriminatory statements at the heart of this case.

77.    Although the District's March 27, 2026, response clarified certain aspects of J.H.'s rights regarding the distribution of religious tracts, it failed to address or remedy the constitutional violations described above.

78.    The District did not repudiate Vice Principal McEwen's viewpoint-discriminatory statements, did not provide the requested written assurances, did not commit to permitting J.H. to discuss her faith and distribute tracts during all non-instructional time free from individualized targeting, and did not confirm that any process for forming a Christian student club would be free of burdens beyond those imposed on other non-curriculum-related student groups.

79.    Viewed in the context of the District's repeated treatment of J.H., the response did not remedy the ongoing pattern of religious discrimination alleged in this Complaint. Subsequent events demonstrated that the District continued to maintain policies and practices that chilled and burdened J.H.'s exercise of her religious rights.

**f.    The Inclusion Assembly on May 29, 2026**

80.    On May 29, 2026, at approximately 12:20 p.m., the entire student body of Sylvester Middle School, including J.H., was required to attend a mandatory school-wide assembly titled the "Inclusion Assembly."

COMPLAINT - Page 11

AMERICAN CENTER FOR LAW & JUSTICE
201 Maryland Ave NE
Washington DC, 20002
(202) 546-8890

81. No notice was given to parents that this event would occur.

82. The District had, in prior years at North Hill Elementary School, provided parents advance notice of similar content, such as pride assemblies in elementary school, allowing the H. family to make arrangements for J.H. not to attend.

83. Because no such notice was provided here, the H. family had no opportunity to opt J.H. out.

84. J.H. was only told by her teachers that this event would occur the morning of the event, and she was given no specificity as to what the event would entail or that it would include content that conflicts with her fundamental religious beliefs.

85. Before the assembly, J.H. and her best friend with shared beliefs spoke to multiple teachers, approximately three, asking about what this assembly would entail and what would be taught.

86. No teacher could provide an answer or any information about what the assembly would contain.

87. The assembly was led principally by a teacher who supervises the lunch period.

88. McEwen, the same Vice Principal who had personally confronted J.H. about her religious expression in February 2026, was present in the gymnasium throughout the assembly and observed the proceedings.

89. McEwen had personal knowledge, from her own February 2026 encounter with J.H., that J.H. holds sincere religious beliefs but took no action to protect them in this assembly.

90. The assembly covered a range of inclusion topics, including racial diversity, disability, and women's rights.

91. The second portion of the assembly, however, was dedicated to LGBTQIA+ content and included a presentation covering seventy-two gender identities, a discussion of sexual orientations and sexual preferences, including binary, transgender, and asexual identities, explicit affirmations such as "happy pride month," student testimonies and the display of various pride

COMPLAINT - Page 12

flags.

92.    The slides were not merely descriptive, but normative and celebratory, encouraging students to accept and celebrate LGBTQIA+ lifestyles and practices in unmistakably moral terms.

93.    For example, slide 29 featured a social media creator known as Flawless Kevin, a transgender individual, and stated that this person's "message to fans is that being 'flawless' means accepting who you are and not being afraid to express yourself."

94.    This same slide displayed a picture of Flawless Kevin cross-dressing.

95.    Slides 32 and 36 featured pictures of individuals dressed in attire conventionally associated with drag performance.

96.    Most importantly, the last portion of the slides was entitled "How to be an Ally." These slides directly encouraged students to be "allies" of the LGBTQIA+ community, providing moral instruction about how people should interact with and "support" that community.

97.    Slide 39 instructs students to "read[] blogs, tweets, news reports, videos, posts" about the sexual identities and communities featured in the assembly.

98.    Slide 40 states that "Anyone Can be An Ally" and that "To be an ally you have to be able to listen and uplift to people [sic] as well as stick up for them and be a supporter."

99.    Slide 42 lists four benefits of being an ally.

100.    Most critically, it states that "When you are standing up against oppression, you are creating a moral standard in your community. You are putting people on notice that targeting any group will not be allowed."

101.    This statement is made under the header of the "benefit" entitled "Setting the Standard."

102.    Slide 42 lists three other benefits as well: unity, with the language "Being a ally [sic] is an antidote to isolation for those targeted by oppression and those in the targeting role-it empowers everyone involved"; involvement, with the language "Our communities need the voices, opinions, and help of people from many different groups. As we reach out to groups, they will

COMPLAINT - Page 13

become more involved in the bigger community"; and humanity, with the language "In the process of becoming an ally, you have an opportunity to regain your humanity in a society that can be dehumanizing."

103. The fact that this material appeared in the assembly's prepared slides reinforces the District's liability.

104. These were not isolated, spontaneous, or offhand remarks by individual students or staff members; they were prewritten, curated, and displayed as part of an official school-sponsored presentation delivered to the entire student body during mandatory school time.

105. The use of slides demonstrates that school officials had an opportunity to review the content in advance, knew or should have known that the presentation included normative instruction on sexual orientation and gender identity, and nevertheless chose to require J.H. and other students' attendance without notice, opt-out, or accommodation.

106. The slides therefore confirm that the challenged content was attributable to the District itself.

107. The assembly included students who participated by sharing their "coming out" stories with the student body.

108. J.H. holds sincere religious beliefs, grounded in her Christian faith, regarding human sexuality and gender.

109. The content of the assembly's LGBTQIA+ portion was directly contrary to those beliefs.

110. On information and belief, another student, a friend of J.H., was present at the assembly despite the fact that her parents had a written accommodation in place for her not to participate in LGBTQIA+ content; the District ignored this accommodation, and she was sent to the assembly regardless.

111. During the assembly, J.H. became emotionally distressed by being presented with teaching that conflicted with her religious beliefs, and began crying.

COMPLAINT - Page 14

AMERICAN CENTER FOR LAW & JUSTICE
201 Maryland Ave NE
Washington DC, 20002
(202) 546-8890

112. Specifically, she started crying because she witnessed her fellow students clapping for what was being presented and was unwilling to participate in such a celebration.

113. She continued crying throughout the events that followed.

114. While J.H. was crying, J.H.'s advisory teacher, Ms. Holmes, asked her what was wrong.

115. J.H. explained that she felt uncomfortable with the LGBTQIA+ content.

116. Rather than being permitted to step out on that basis, J.H.'s discomfort was concealed from the assembly organizers: Ms. Holmes told school officials that J.H. needed to use the restroom, so that J.H. could briefly exit without disclosing her religious objection.

117. Another teacher, Ms. Edwards, led J.H. to a hallway, and saw that the bathrooms were closed and asked her if she was ok.

118. J.H. explained that she was ok, but she was not comfortable being in the assembly learning about the LGBTQIA+ community.

119. The District was on notice of the H. family's religious beliefs, both from past opt-out accommodations that had been granted to the H. family and the past disciplinary action taken against J.H. for her religious beliefs.

120. Ms. Edwards responded that "they aren't forcing their belief on you, but they are informing you about this."

121. In response, J.H. explained that she was a Christian and that the teaching of the assembly conflicted with her closely held religious beliefs, specifically explaining that, as a Christian, she did not agree with LGBTQIA+ beliefs, but she respected them.

122. J.H. repeated that she simply did not feel comfortable going back inside.

123. J.H. was severely emotionally distressed, and her emotional distress was visible to Ms. Edwards.

124. Ms. Edwards then told J.H. directly: "You have no choice because me and Ms. Holmes told the people in charge that you had to use the bathroom."

AMERICAN CENTER FOR LAW & JUSTICE
201 Maryland Ave NE
Washington DC, 20002
(202) 546-8890

125. Then Ms. Edwards walked into the gym, signaling to J.H. that she had to come inside.

126. J.H. re-entered the assembly under this compulsion and spent the remaining period of the assembly in tears, deliberately averting her eyes from the imagery being displayed.

127. During the assembly, Vice Principal McEwen remained in the rear of the room observing from a distance J.H.'s request to leave, but refused to make a reasonable accommodation, despite having direct knowledge of J.H.'s deeply held religious beliefs.

128. When the assembly ended, J.H. walked to class and continued to cry.

129. J.H.'s distress was visible to classmates and teachers alike.

130. After the assembly, several teachers approached J.H. and asked her why she was crying.

131. None of J.H.'s teachers or any other school administration informed her parents of the assembly, the infringement upon their closely held religious beliefs, or the severe distress she experienced.

132. The facts here go beyond passive classroom exposure: the District coordinated the assembly; intentionally withheld information from parents about the assembly; and compelled students, including J.H., to attend the assembly devoted to LGBTQIA+ celebration and moral instruction. The District then refused to release her when she personally and explicitly invoked her religious objection, and affirmatively told her she had "no choice."

133. The Inclusion Assembly also illustrates the same viewpoint discrimination described above.

134. The District affirmatively promoted a particular viewpoint on human sexuality and gender through mandatory assembly attendance and provided student speakers a school-sponsored platform to discuss their sexual identities, preferences, and orientations, despite having targeted J.H. for quietly distributing Christian tracts reflecting a traditional religious viewpoint to willing classmates.

AMERICAN CENTER FOR LAW & JUSTICE
201 Maryland Ave NE
Washington DC, 20002
(202) 546-8890

135. The District's Policy 2331 – Controversial Issues/Guest Speakers – addresses the required school actions when events are held or topics are taught that address potentially controversial issues. The policy states as follows:[3]

> The superintendent or designee shall establish procedures for the approval of the use of a guest speaker. When an invited speaker expresses opinions which are partisan or considered controversial by a large portion of the community, the school shall provide for the presentation of opposing views.
>
> A. If the teacher and the principal believe the guest speaker's topic is controversial, they will develop a plan whereby the issue(s) can be presented in an objective unbiased manner.

136. Procedure 2340 states that "Students who choose not to participate in school activities which are offensive to their beliefs, shall not be penalized or subjected to pressure to choose between participation in such activities and their religious belief."

137. The District's actions here ignored that procedure.

138. On June 18, 2026, the H. family, by and through the ACLJ, sent a third demand letter to Superintendent Dr. Ivan Duran of Highline Public Schools (attached hereto as Exhibit E) setting forth the foregoing facts and demanding written assurances that (1) the District would not conduct mandatory assemblies covering content that students or parents find religiously objectionable without advance written parental notice and a meaningful, non-stigmatizing opportunity to opt out; (2) that the District would instruct its staff that a student's religious objection is a legally cognizable basis for excusal and that staff may not tell a student she has "no choice" but to remain; and (3) that the District would take appropriate remedial steps, including staff training, to address this pattern of conduct.

139. The letter set a deadline of June 25, 2026, for the District's written response.

g.     **The District's Final Response**

---

[3] Policy 2331 – Controversial Issues/Guest Speakers, HIGHLINE PUB. SCH., https://www.highlineschools.org/about/board-policies/policy-details/~board/board-policies/post/policy-2331-controversial-issuesguest-speakers

COMPLAINT - Page 17

140.    On June 25, 2026, following receipt of Plaintiffs' demand letter, the District, through counsel, submitted a written response regarding the May 29, 2026, Inclusion Assembly. (Exhibit F)

141.    In that response, the District did not dispute that the Inclusion Assembly addressed topics relating to LGBTQ+ identities, sexual orientation, gender identity, disability, mental health, and inclusion.

142.    The District further acknowledged that school personnel interacted with J.H. after observing that she had become upset during the assembly, particularly acknowledging that J.H. became upset during the assembly.

143.    The District nevertheless denied that J.H.'s constitutional rights were violated and denied that school personnel improperly refused her request to be excused from the assembly.

144.    The District specifically asserted that assemblies at Sylvester Middle School are not mandatory, that students may excuse themselves from assemblies, and that students who choose not to attend are permitted to report to an alternative location.

145.    The District further asserted that students may choose not to attend assemblies for any reason and that school personnel do not require students to articulate a reason for declining attendance.

146.    The District claimed that J.H. "chose to re-enter the assembly and remained there for the duration of the event."

147.    Plaintiffs deny those assertions.

148.    Consistent with the allegations set forth herein, J.H. was informed by a school employee that she had "no choice" but to return to the Inclusion Assembly after she expressed a religious objection to the content being presented.

COMPLAINT - Page 18

AMERICAN CENTER FOR LAW & JUSTICE
201 Maryland Ave NE
Washington DC, 20002
(202) 546-8890

149. J.H. did not voluntarily choose to return to or remain in the assembly.

150. At all relevant times, J.H. reasonably understood school personnel to be directing her to remain in attendance at the assembly notwithstanding her objection.

151. J.H. returned to the assembly only because she understood that she was being directed by school officials to do so.

152. Her return was the product of coercion by school officials exercising their authority over her as a student, not the result of her own free and voluntary choice.

153. The District's assertion that students possess a broadly available and well-known right to excuse themselves from assemblies is not reflected in the student-facing assembly guidance contained within the Sylvester Middle School Student Handbook.

154. The Student Handbook provides that students are to proceed to assemblies with their teachers, follow staff directions regarding seating and behavior during assemblies, comply with assembly expectations, and dismiss only as directed by staff.

155. The Student Handbook does not inform students that assemblies are voluntary, that students may independently excuse themselves for any reason, or that an alternative location is available for students who elect not to attend an assembly.

156. Instead, it at least strongly suggests that assemblies are mandatory.

157. Upon information and belief, no written policy, handbook provision, announcement, or student notice informed J.H. before the Inclusion Assembly that she could excuse herself from attendance, leave the assembly after it began, or report to an alternative location instead of attending.

158. J.H. was not provided a meaningful accommodation for her religious objection on May 29.

COMPLAINT - Page 19

AMERICAN CENTER FOR LAW & JUSTICE
201 Maryland Ave NE
Washington DC, 20002
(202) 546-8890

159. Jonathan H. is suffering irreparable injury because Defendants' ongoing policies, customs, and practices continue to interfere with his constitutional right to direct the religious and moral upbringing of his child.

160. The District has not provided meaningful assurances that it will give him advance notice before exposing J.H. to school-sponsored programming that conflicts with his sincerely held religious beliefs; has not adopted any policy ensuring a meaningful opt-out or accommodation; and has not repudiated its decision to compel J.H.'s attendance at the May 29, 2026, Inclusion Assembly despite the H. family's known religious objections.

161. As a result, Jonathan H. remains unable to exercise his religious duty to decide when, how, and by whom his child will be instructed on matters of sexuality, gender, conscience, and moral truth.

162. That injury cannot be remedied fully by money damages.

163. Each day J.H. remains enrolled in the District's schools without binding assurances, notice procedures, or opt-out protections, Jonathan H. faces an ongoing and credible threat that the District will again override his parental and religious authority by subjecting his child to school-sponsored moral instruction that conflicts with the family's faith.

164. The continuing deprivation of his Free Exercise rights and his fundamental parental right to direct the religious and moral formation of his child constitutes irreparable harm and leaves him with no adequate remedy at law absent declaratory and injunctive relief.

**h.    The District Has Maintained a Policy and Practice of Viewpoint Discrimination.**

165. Sylvester Middle School maintains a limited open forum for student expression during non-instructional time by permitting students to share opinions, engage in peer discussions, and even leave campus to engage in political protests.

COMPLAINT - Page 20

AMERICAN CENTER FOR LAW & JUSTICE
201 Maryland Ave NE
Washington DC, 20002
(202) 546-8890

166.    Within that open forum, school officials have selectively and explicitly excluded religious expression—specifically, the expression of religious viewpoints through gospel tract distribution and faith-related conversation.

167.    The District's own officials have articulated this policy and practice of viewpoint discrimination with candor. McEwen explicitly told J.H. that students may share opinions but not religious beliefs, and then contrasted political protest—which the school permits and facilitates by allowing students to leave campus during school hours—with J.H.'s religious expression, which she forbade.

168.    J.H.'s distribution of tracts during non-instructional time to consenting classmates is quintessentially student-initiated private speech entitled to the full protection of the First Amendment.

169.    The District cannot identify any material and substantial disruption caused by J.H.'s consent-based, student-initiated religious expression.

170.    The District's own Board Policy on Freedom of Expression, Procedure 3220, confirms that students may express opinions on school premises and that a school official must base any forecast of material and substantial disruption on specific facts.[4]

171.    At all times relevant to this Complaint, the acts alleged herein were performed by Defendants under color of statutes, regulations, customs, and usages of the State of Washington.

172.    The District has been directly informed of these violations through three written demand letters from counsel.

173.    The District has remained deliberately indifferent to the violation of J.H.'s First Amendment rights and to the breach of its own written agreement.

i.    **The District's Pattern of Religious Discrimination Against J.H.**

174.    The allegations set forth above demonstrate an overarching pattern of religious

---

[4] Policy 3220 – Freedom of Expression, HIGHLINE PUB. SCH., https://www.highlineschools.org/about/board-policies/policy-details/~board/board-policies/post/policy-3220-freedom-of-expression.

COMPLAINT - Page 21

AMERICAN CENTER FOR LAW & JUSTICE
201 Maryland Ave NE
Washington DC, 20002
(202) 546-8890

animus and hostility toward J.H.'s religious beliefs and religious exercise.

175. This case does not involve an isolated misunderstanding or a single constitutional violation. Rather, it reflects a continuing pattern in which the District has repeatedly burdened J.H.'s religious expression, disregarded her family's sincerely held religious beliefs, and treated religious viewpoints less favorably than comparable secular viewpoints.

176. Over the course of several years, the District has repeatedly been placed on notice of these constitutional deficiencies through demand letters, written responses, and direct interactions with J.H. and her family.

177. Despite that notice, District officials have continued to burden J.H.'s religious exercise, compel her participation in activities that conflict with her religious beliefs, and fail to provide meaningful assurances that similar violations will not recur.

178. Despite three separate opportunities over a period of more than four years to correct its treatment of J.H. after receiving formal notice from Plaintiffs' counsel, the District has continued to burden J.H.'s religious exercise and constitutional rights.

179. The recurring nature of these incidents, together with the District's repeated refusal to meaningfully correct or repudiate the conduct of its employees after receiving actual notice, demonstrates that the constitutional violations alleged herein are not isolated events but instead are the product of District policies, customs, practices, ratification, or deliberate indifference.

180. J.H. is suffering irreparable harm from the ongoing policies, customs, and practices of Defendants that violate her constitutional rights, which cannot be fully compensated by an award of money damages alone.

181. Because J.H. remains enrolled in the District's schools and intends to continue exercising her constitutional rights, she has no adequate remedy at law and faces an ongoing and credible threat that these constitutional violations will recur absent declaratory and injunctive

COMPLAINT - Page 22

relief.

## CAUSES OF ACTION

### <u>COUNT I</u>
**Violation of Plaintiff's First Amendment Right to Freedom of Speech: Viewpoint Restriction in Tract Distribution**
**(U.S. Const. amend. I; 42 U.S.C. § 1983)**

182.    Plaintiff repeats, realleges, and incorporates by reference herein all preceding paragraphs as though fully set forth herein.

183.    Pursuant to 42 U.S.C. § 1983, Plaintiff brings this claim against Defendants for acting under color of state law to deprive J.H. of her First Amendment right to free speech, as guaranteed by the United States Constitution and made applicable to the States through the Fourteenth Amendment.

184.    Plaintiff Jonathan H. brings this claim on behalf of his minor child J.H.

185.    To establish a violation of the Free Speech Clause, Plaintiff can show that (1) she engaged in protected speech, (2) Defendants, acting under color of state law, restricted or burdened that speech, and (3) the restriction was based on the content or viewpoint of the speech or was unsupported by a material and substantial disruption to the educational environment.

186.    School officials may not censor student expression unless it causes a material and substantial disruption to the school's educational mission.

187.    Defendants can point to no such disruption.

188.    Even more fundamental is the prohibition against viewpoint discrimination.

189.    Viewpoint discrimination, treating speech less favorably because of the particular perspective it expresses, is among the most egregious forms of content-based restriction and is subject to strict scrutiny.

190.    The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction.

191.    Discrimination against speech because of its message is presumed to be unconstitutional.

COMPLAINT - Page 23

AMERICAN CENTER FOR LAW & JUSTICE
201 Maryland Ave NE
Washington DC, 20002
(202) 546-8890

192.    Religious speech is fully protected by the First Amendment and may not be singled out for disparate treatment.

193.    Defendants have opened a forum for student expression during non-instructional time. In that forum, students are permitted to share opinions, engage in peer discussions, and leave campus for political protests.

194.    By selectively excluding religious expression from that forum, Defendants have engaged in paradigmatic viewpoint discrimination.

195.    The District's own Board Policy, Procedure 3220, confirms that students may express opinions on school premises so long as there is no material and substantial disruption, and that any forecast of disruption must be based on specific facts, not undifferentiated fear or apprehension.

196.    Defendants knew or should have known that prohibiting one student's religious speech while permitting secular and political speech constitutes a violation of clearly established First Amendment rights.

197.    McEwen's conduct, removing J.H. from class, explicitly prohibiting her religious expression, and articulating a viewpoint-discriminatory policy in no uncertain terms, constituted a violation of J.H.'s clearly established First Amendment rights while acting under color of state law.

198.    By failing to remedy this ongoing violation after being placed on notice through three written demand letters—and after expressly disputing, rather than correcting, the constitutional violation in its March 27, 2026, response—the District has adopted and ratified McEwen's conduct as its own policy and custom and has displayed deliberate indifference to the ongoing violation of J.H.'s First Amendment rights.

199.    Because of Defendants' actions, Plaintiff has suffered and continues to suffer irreparable harm.

200.    Defendant McEwen is individually liable for this violation, and the District is liable for the reasons set forth above, including under the ratification and persistent-practice theories

COMPLAINT - Page 24

AMERICAN CENTER FOR LAW & JUSTICE
201 Maryland Ave NE
Washington DC, 20002
(202) 546-8890

alleged herein.

201.    Plaintiff is entitled to an award of equitable relief.

202.    Plaintiff is entitled to a declaration that Defendants violated J.H.'s First Amendment right to freedom of speech and an injunction against Defendants' policy and actions.

203.    Additionally, Plaintiff is entitled to damages in an amount to be determined by the evidence, reasonable costs of this lawsuit, and reasonable attorneys' fees.

**COUNT II**

**Violation of the First Amendment Right to Free Exercise of Religion – Tract Distribution
(U.S. Const. amend. I; 42 U.S.C. § 1983)**

204.    Plaintiff repeats, realleges, and incorporates by reference all preceding paragraphs as though fully set forth herein.

205.    Plaintiff Jonathan H. brings this claim on behalf of his child J.H.

206.    The Free Exercise Clause of the First Amendment, made applicable to the States through the Fourteenth Amendment, prohibits governmental entities from burdening the free exercise of religion without a compelling governmental interest pursued by the least restrictive means.

207.    To establish a violation of the Free Exercise Clause, Plaintiff must show that (1) she engaged in sincere religious exercise, (2) Defendants imposed a burden on that religious exercise, and (3) the burden resulted from a policy or practice that was not neutral or generally applicable, or otherwise fails strict scrutiny.

208.    J.H.'s distribution of gospel tracts and discussion of her faith with willing classmates during non-instructional time constitute sincere religious exercise motivated by her devout Christian beliefs.

209.    Defendants have prohibited J.H. from engaging in this sincere religious exercise while permitting students to engage in equivalent secular expressive activity, including sharing political opinions.

210.    The District is liable under § 1983 because the burden on J.H.'s religious exercise

COMPLAINT - Page 25

AMERICAN CENTER FOR LAW & JUSTICE
201 Maryland Ave NE
Washington DC, 20002
(202) 546-8890

was not an isolated act by a rogue employee, but the product of District policy, custom, ratification, and deliberate indifference.

211. The District had actual notice from the 2022 incident, the 2022 written agreement, and Plaintiffs' March 20, 2026, demand letter that J.H. was entitled to engage in religious expression on equal terms during non-instructional time.

212. Yet after McEwen again singled out J.H.'s religious expression for prohibition, the District failed to repudiate her statement that students may share opinions but not religious beliefs, failed to provide the requested written assurances, and instead characterized the incident as ordinary enforcement of school rules.

213. By declining to correct or disavow that religion-based restriction after actual notice, the District adopted, ratified, and perpetuated the burden on J.H.'s religious exercise.

214. A law or governmental policy is not neutral and generally applicable—and cannot survive strict scrutiny—when the government selectively imposes burdens on religiously motivated conduct while permitting comparable secular conduct.

215. The District's policy as applied here is neither neutral nor generally applicable: it explicitly treats religious expression less favorably than secular expression.

216. Such a policy is subject to strict scrutiny and is unconstitutional.

217. Defendants have no compelling interest in prohibiting J.H.'s quiet religious expression during non-instructional time, and no such prohibition is narrowly tailored.

218. Defendants' actions have substantially burdened J.H.'s sincere religious exercise in violation of the Free Exercise Clause as protected by 42 U.S.C. § 1983.

219. Defendants' response letter failed to repudiate Defendant McEwen's statement, and so the chilling of Plaintiff's religious speech was left in place.

220. Plaintiff is entitled to declaratory and injunctive relief, compensatory or nominal damages, and attorneys' fees.

**COUNT III**
**Violation of the First Amendment Right to Free Exercise: Assembly**

COMPLAINT - Page 26

AMERICAN CENTER FOR LAW & JUSTICE
201 Maryland Ave NE
Washington DC, 20002
(202) 546-8890

**(U.S. Const. amend. I; 42 U.S.C. § 1983)**

221.    The Free Exercise Clause of the First Amendment, made applicable to the States through the Fourteenth Amendment, protects an individual's right to live in accordance with sincerely held religious beliefs and prohibits the government from substantially burdening religious exercise without sufficient constitutional justification.

222.    J.H. holds sincere religious beliefs, grounded in her Christian faith, regarding human sexuality and gender.

223.    Plaintiff Jonathan H. brings this claim on behalf of his child J.H.

224.    Those beliefs are not merely abstract opinions but are religious convictions that inform her conduct, conscience, and daily life.

225.    Students do not shed their constitutional rights to freedom of speech or expression at the schoolhouse gate, and may not be regarded as closed-circuit recipients of only that which the State chooses to communicate.

226.    Defendants compelled J.H.'s attendance at, and continued presence within, the May 29, 2026, Inclusion Assembly, which contained extensive normative messaging regarding sexual orientation and gender identity that directly conflicted with J.H.'s sincerely held religious beliefs.

227.    When J.H. sought to be excused, school staff refused to release her, concealed her objection from assembly organizers, and expressly told her that she had "no choice" but to remain.

228.    J.H. did not merely express generalized discomfort with the assembly. She expressly told school staff that she was a Christian and that the assembly's teaching conflicted with her sincerely held religious beliefs. Defendants therefore had actual notice that J.H.'s request to leave was an exercise of religious conscience.

229.    Government-sponsored content that might conflict with religious beliefs carries a heightened risk of unconstitutional coercion in the school context, and that coercive dynamic is present here: school officials used their institutional authority to override J.H.'s religious conscience and compel her continued attendance and participation.

230.    The burden imposed on J.H.'s religious exercise was substantial. Defendants did

COMPLAINT - Page 27

AMERICAN CENTER FOR LAW & JUSTICE
201 Maryland Ave NE
Washington DC, 20002
(202) 546-8890

not merely expose J.H. to an idea with which she disagreed; rather, after J.H. affirmatively invoked her religious objection and requested relief, Defendants refused to accommodate that objection and used their authority as school officials to require her continued attendance.

231.    By requiring J.H. to return to and remain in the assembly after she expressly identified her Christian faith as the basis for her objection, Defendants substantially burdened her religious exercise and overrode her religious conscience.

232.    Defendants' actions were not the least restrictive means of advancing any compelling governmental interest.

233.    Permitting J.H. to leave the assembly, relocate to an alternate location, or otherwise excuse herself from participation would have imposed little or no burden upon Defendants and would have fully accommodated her religious exercise.

234.    Defendants' actions burdened J.H.'s exercise of religion in violation of the First Amendment.

235.    Defendant McEwen is individually liable for this violation because she possessed personal knowledge of J.H.'s religious beliefs, was present during the assembly, had supervisory authority over the proceedings, and failed to intervene to protect J.H.'s constitutional rights.

236.    The District is liable because the conduct described herein was undertaken pursuant to District policies, customs, practices, ratification, and deliberate indifference to known violations of students' constitutional rights.

237.    The compelled assembly attendance and refusal to accommodate J.H.'s religious objection were attributable to District policy, custom, ratification, and deliberate indifference.

238.    The Inclusion Assembly was not an isolated classroom comment or spontaneous staff action; it was an official, school-wide presentation delivered during the school day, using

COMPLAINT - Page 28

school facilities, school personnel, prepared slides, and a captive student audience.

239.    District personnel knew or should have known in advance that the assembly contained normative instruction on sexuality and gender that would conflict with some students' sincerely held religious beliefs.

240.    Yet the District provided no advance notice, no meaningful opt-out, and no religious accommodation, and then ratified the refusal to excuse J.H. by denying any violation after receiving Plaintiffs' third demand letter.

241.    As a direct and proximate result of Defendants' conduct, J.H. suffered the deprivation of her constitutional rights and other injuries to be proven at trial.

242.    Plaintiff is entitled to declaratory and injunctive relief, compensatory or nominal damages, and attorneys' fees.

## COUNT IV
**Violation of the First Amendment Right to Free Exercise of Religion – Failure to Provide Notice and Opt-Out**
**(U.S. Const. amend. I; 42 U.S.C. § 1983)**

243.    Plaintiff repeats, realleges, and incorporates by reference all preceding paragraphs as though fully set forth herein.

244.    Plaintiff Jonathan H. brings this claim on behalf of himself.

245.    Pursuant to 42 U.S.C. § 1983, Plaintiff brings this claim against Defendants for acting under color of state law to deprive him of his right to the free exercise of religion as guaranteed by the First and Fourteenth Amendments to the United States Constitution.

246.    To establish a Free Exercise violation arising from compelled exposure to instruction affecting religious belief, Plaintiff Jonathan H. must show that (1) he possesses sincere religious beliefs regarding the subject matter presented, (2) Defendants compelled participation in instruction that substantially burdened those beliefs, and (3) Defendants failed to provide timely notice, a meaningful opportunity to opt out, or another constitutionally sufficient accommodation.

247.    Jonathan H.'s sincerely held religious beliefs require that he direct the moral and

COMPLAINT - Page 29

AMERICAN CENTER FOR LAW & JUSTICE
201 Maryland Ave NE
Washington DC, 20002
(202) 546-8890

spiritual education of his child in accordance with his Christian faith.

248. When a public school requires children to attend instruction presenting normative messages regarding gender and sexuality that substantially interfere with the religious development of the child, the Free Exercise Clause is burdened, and strict scrutiny applies, unless parents are afforded timely notice and a practical opportunity to excuse their children.

**A.    The Inclusion Assembly Substantially Burdened Plaintiff's Religious Beliefs.**

249. The Inclusion Assembly compelled J.H.'s attendance at, and continued presence within, instruction presenting normative messaging regarding sexual orientation and gender identity that posed a very real threat of undermining the religious beliefs that J.H. and her parents hold and wish to instill.

250. The content of the assembly was more than merely descriptive; it was normative.

251. The presentation did not simply inform students that differing views regarding sexuality and gender exist. Rather, it repeatedly instructed students regarding the attitudes, beliefs, and moral commitments they should adopt concerning those subjects.

252. The clearest example is the slide including material entitled "Setting the Standard," which told students that "When you are standing up against oppression, you are creating a moral standard in your community" and "putting people on notice" that targeting any group would not be allowed.

253. That language did not merely describe the existence of differing identities or viewpoints; it supplied a moral framework and instructed students on what moral position they should adopt.

254. For religious parents who believe they are responsible before God for directing their child's moral formation, compelled exposure to that official school-sponsored moral instruction—without notice or opt-out—substantially burdened their religious exercise.

255. Nor was the "Setting the Standard" statement an isolated statement. The assembly repeatedly encouraged students to adopt, affirm, and promote a particular moral viewpoint

COMPLAINT - Page 30

AMERICAN CENTER FOR LAW & JUSTICE
201 Maryland Ave NE
Washington DC, 20002
(202) 546-8890

regarding sexuality and gender.

256. Students were taught that being an "ally" required them to "listen and uplift" others, "stick up for them," and act as supporters of the LGBTQIA+ community.

257. The presentation further taught that allyship would help students achieve greater "unity," increase community "involvement," and even help participants "regain [their] humanity."

258. These messages did not merely convey information about the existence of LGBTQIA+ individuals or differing viewpoints regarding sexuality and gender.

259. Rather, they instructed students regarding the attitudes and moral commitments they should embrace and encouraged students to view those commitments as socially beneficial and morally desirable.

260. The assembly likewise featured affirming and celebratory content regarding LGBTQIA+ identities.

261. Students were presented with material discussing seventy-two gender identities, various pride flags, and a featured transgender social-media personality whose message was that being "flawless" means accepting who you are and not being afraid to express yourself.

262. Student speakers were also given a school-sponsored platform to share "coming out" stories before a captive audience.

263. Viewed together, these components conveyed a consistent normative message of affirmation, acceptance, and celebration rather than mere exposure to the fact that differing viewpoints exist.

264. The District knew the assembly would violate the religious beliefs of some of its students.

265. This is evident because the school had always provided advance notice in the past, and another student had an opt out in place.

266. This time, the District intentionally chose not to offer parents an opt-out opportunity.

COMPLAINT - Page 31

AMERICAN CENTER FOR LAW & JUSTICE
201 Maryland Ave NE
Washington DC, 20002
(202) 546-8890

267.    The burden imposed on Plaintiff therefore arose from far more than exposure to ideas with which he disagrees.

268.    Defendants substantially burdened Plaintiff Jonathan H.'s religious exercise by interfering with his ability to shield J.H. from school-sponsored moral instruction that conflicted with his sincerely held religious beliefs regarding sexuality and gender.

269.    The District required J.H. to attend an assembly that repeatedly promoted a particular moral framework, instructed students how they should think and act regarding contested questions of sexuality and gender, and encouraged students to adopt and advocate for those positions as a community "moral standard."

270.    By not providing notice, refusing an opt-out, and compelling J.H. to remain after she expressly raised an objection, Defendants deprived Jonathan H. of his ability to direct J.H.'s moral and religious formation on precisely the subjects he believes Scripture entrusts to parental instruction.

271.    Defendants further burdened Plaintiff's religious exercise by denying him the notice and accommodation necessary to exercise that choice.

**B.    Defendants' Conduct Violated Strict Scrutiny.**

272.    Defendants provided neither J.H. nor her parents advance notice of the assembly's LGBTQIA+ content nor any meaningful opportunity to excuse J.H. from attendance, notwithstanding that the District had itself previously provided such notice to the H. family when similar programming was offered at the elementary school level.

273.    Defendants' failure to provide advance notice and a meaningful opportunity to opt out cannot survive strict scrutiny.

274.    Defendants have no compelling interest in compelling J.H.'s attendance without notice or accommodation, and no such compulsion is narrowly tailored.

275.    Defendants' actions were neither neutral nor generally applicable but were conducted with deliberate indifference to religiously based parental objections.

COMPLAINT - Page 32

AMERICAN CENTER FOR LAW & JUSTICE
201 Maryland Ave NE
Washington DC, 20002
(202) 546-8890

276.    Excusing a student from a mandatory assembly would be straightforward for the District to implement.

277.    Defendants' actions ignored less restrictive alternatives, such as excusing students from the assembly based on fundamental religious beliefs.

278.    Defendants' failure to provide notice and an opt-out was compounded when, during the assembly, J.H. expressly informed school staff that she was Christian and that the content conflicted with her religious beliefs, yet staff still required her to return to the assembly rather than provide an immediate accommodation.

279.    Defendant McEwen is individually liable for this violation for the same reasons set forth above: her personal knowledge of J.H.'s religious beliefs, her presence and supervisory authority during the assembly, and her failure to intervene to ensure that J.H. and her parents received the notice and opportunity to opt out to which they were constitutionally entitled.

280.    The District is liable under § 1983 because the failure to provide notice and an opt-out opportunity was the product of official District policy, custom, practice, ratification, and deliberate indifference.

281.    The assembly was school-sponsored, planned in advance, delivered to the entire student body during school hours, and governed by District and school rules concerning assemblies, controversial issues, religious accommodation, and student participation.

282.    The District had previously provided the H. family notice of similar programming and had actual notice of the family's religious objections, yet abandoned that practice here without explanation. After being notified that the lack of notice and opt-out violated Plaintiffs' rights, the District refused to acknowledge or remedy the violation, thereby ratifying the unconstitutional practice.

283.    Plaintiff is entitled to declaratory and injunctive relief, including an order compelling the District to provide advance notice and a meaningful opportunity to opt out of future programming that conflicts with sincerely held religious beliefs, as well as compensatory or

COMPLAINT - Page 33

nominal damages and attorneys' fees.

## COUNT V
### Violation of the Fourteenth Amendment Right of Parents to Direct the Upbringing, Education, and Religious Development of Their Children
### (U.S. Const. amend. XIV; 42 U.S.C. § 1983)

284.    Plaintiff repeats, realleges, and incorporates by reference all preceding paragraphs as though fully set forth herein.

285.    Plaintiff Jonathan H. brings this claim on behalf of himself.

286.    Pursuant to 42 U.S.C. § 1983, Plaintiff Jonathan H. brings this claim against Defendants for acting under color of state law to deprive him of his right to direct the upbringing and education of his child as protected by the Fourteenth Amendment.

287.    To establish a violation of the parental rights protected by the Fourteenth Amendment, Plaintiff must show that (1) he possesses a fundamental liberty interest in directing the upbringing, education, and religious development of his child, (2) Defendants substantially interfered with that interest, and (3) the interference cannot survive the applicable level of constitutional scrutiny.

288.    The Fourteenth Amendment's Due Process Clause protects the fundamental liberty interest of parents in directing the upbringing, education, and religious and moral development of their children.

289.    This right exists independently of, and provides an additional basis of protection alongside, the Free Exercise Clause.

290.    The right recognized in this line of cases is not limited to the choice of where to send a child to school, but extends to a parent's authority to guide and control the moral and religious instruction their children receive, particularly on subjects, such as human sexuality and gender, that are inextricably bound up with deeply held familial and religious values.

291.    By compelling J.H.'s attendance at, and continued participation in, the Inclusion Assembly's instruction on sexual orientation and gender identity, without providing J.H.'s parents advance notice or any opportunity to exempt their daughter, Defendants usurped the H. family's

COMPLAINT - Page 34

AMERICAN CENTER FOR LAW & JUSTICE
201 Maryland Ave NE
Washington DC, 20002
(202) 546-8890

authority to determine when, how, and by whom their child would be instructed on these deeply contested and religiously significant subjects.

292. This deprivation is compounded by the fact that the District had, at an earlier point in J.H.'s education, recognized and honored the H. family's right to be notified of similar content and to exercise their parental judgment by keeping J.H. out of it, only to abandon that practice here without explanation or accommodation.

293. Defendants' conduct was not narrowly tailored to serve any compelling, or even legitimate, government interest.

294. Defendants had readily available alternatives—including advance notice and an opt-out procedure, which the District has itself used before—that would have accommodated parental authority without sacrificing any pedagogical objective.

295. Defendants' conduct violated the H. family's fundamental right under the Fourteenth Amendment to direct the upbringing, education, and religious and moral development of their child.

296. Defendants' conduct violated Policy 2331 and the District's prior written agreements as discussed above.

297. The District's policy and the school's prior accommodation demonstrate the practicability of the accommodation and the minimal imposition the H. family's religious beliefs place on the school's curriculum.

298. Defendant McEwen is individually liable for this violation for the same reasons set forth above.

299. The District is liable under § 1983 because the interference with Jonathan H.'s parental rights was caused by District policy, custom, practice, ratification, and deliberate indifference.

300. The challenged conduct flowed from official school programming, assembly procedures, student-facing handbook expectations, the District's abandonment of its prior practice

COMPLAINT - Page 35

of providing notice for similar content, and its refusal to correct the violation after receiving actual notice through Plaintiffs' third demand letter.

301. By requiring J.H.'s attendance at school-sponsored moral instruction on sexuality and gender without advance parental notice or a meaningful opt-out, and by later defending rather than remedying that practice, the District adopted and ratified the deprivation of Jonathan H.'s constitutional right to direct the religious and moral upbringing of his child.

302. Plaintiff is entitled to declaratory and injunctive relief, compensatory or nominal damages, and attorneys' fees.

### COUNT VI
**Pattern and Practice of Religious Discrimination – Violation of the First Amendment Right to Free Exercise of Religion and Equal Protection**

**(U.S. Const. amend. I, XIV; 42 U.S.C. § 1983)**

303. Plaintiff repeats, realleges, and incorporates by reference all preceding paragraphs as though fully set forth herein.

304. Plaintiff Jonathan H. brings this claim on behalf of his minor child J.H.

305. Pursuant to 42 U.S.C. § 1983, Plaintiff brings this claim against Defendants for acting under color of state law to deprive J.H. of her right to the free exercise of religion, as guaranteed by the First Amendment to the United States Constitution and made applicable to the States through the Fourteenth Amendment, and of her Fourteenth Amendment right to equal protection.

306. The Free Exercise Clause prohibits governmental policies, customs, and practices that target religious exercise for disfavored treatment, burden religious conduct because of its religious character, or fail to operate neutrally and generally.

307. A policy or practice that burdens religious exercise because it is religious is subject to strict scrutiny.

COMPLAINT - Page 36

AMERICAN CENTER FOR LAW & JUSTICE
201 Maryland Ave NE
Washington DC, 20002
(202) 546-8890

308.    The Equal Protection Clause prohibits the government from treating similarly situated persons differently without sufficient justification, and applies with particular force where the differential treatment is based on the religious viewpoint of the speaker.

309.    J.H.'s distribution of Christian gospel tracts, discussion of her faith with willing classmates, request to form a Christian student club, and objection to compelled participation in school-sponsored moral instruction that conflicted with her Christian beliefs are all exercises of religion protected by the Free Exercise Clause and the Equal Protection Clause.

310.    J.H. is similarly situated to other students who engage in personal expression, share viewpoints with classmates, distribute or discuss ideas, participate in student clubs, and receive school-sponsored opportunities to express or affirm secular moral, political, or social viewpoints during the school day.

311.    Defendants treated J.H. less favorably than those similarly situated students because her expression and objections were religious.

312.    Students were permitted to share secular opinions and political viewpoints, including participating in anti-ICE protest activity facilitated by school personnel, while J.H. was singled out and prohibited from distributing Christian gospel tracts and discussing her faith with willing classmates during non-instructional time.

313.    Defendant McEwen made the discriminatory classification explicit when she told J.H. that students may share opinions but may not share religious beliefs.

314.    That statement was not a neutral enforcement of time, place, or manner rules; it was an express distinction between secular expression, which Defendants permitted, and religious expression, which Defendants prohibited.

COMPLAINT - Page 37

AMERICAN CENTER FOR LAW & JUSTICE
201 Maryland Ave NE
Washington DC, 20002
(202) 546-8890

315. Defendants' discriminatory treatment was reinforced by the May 29, 2026, Inclusion Assembly.

316. The District used official school time, school facilities, school personnel, and a captive student audience to promote secular moral viewpoints concerning sexuality and gender, including the instruction that students should help create a community "moral standard," while refusing to accommodate J.H.'s religious objection to that same school-sponsored moral instruction.

317. When J.H. explained that she was Christian and that the assembly's teaching conflicted with her religious beliefs, Defendants did not provide the same freedom of conscience, accommodation, or expressive dignity afforded to secular viewpoints.

318. Instead, school staff told her she had "no choice" but to return and remain.

319. The pattern is not incidental.

320. Each time J.H. engaged in, asserted, or sought protection for religious belief, District personnel responded by treating her differently from students advancing secular viewpoints: confiscating or suppressing her religious materials in elementary school, confronting and prohibiting her religious tract distribution in middle school, refusing to repudiate the express rule that students may not share religious beliefs, and later compelling her continued attendance at religiously objectionable programming after she identified her Christian objection.

321. Defendants' conduct was not neutral or generally applicable.

322. Across multiple years, multiple schools, multiple administrators, and multiple incidents, District personnel repeatedly burdened J.H.'s religious exercise because it was religious: first by confiscating and suppressing her religious materials at North Hill Elementary School; then by confronting and prohibiting her religious tract distribution at Sylvester Middle School; then by

COMPLAINT - Page 38

AMERICAN CENTER FOR LAW & JUSTICE
201 Maryland Ave NE
Washington DC, 20002
(202) 546-8890

refusing to repudiate McEwen's express rule that students may share opinions but not religious beliefs; and finally by compelling J.H. to remain in school-sponsored moral instruction after she expressly identified her Christian objection and requested to be excused.

323. This disparate treatment reflects a policy and practice of religious discrimination.

324. The District has repeatedly burdened J.H.'s religious expression and religious exercise across multiple years, multiple schools, multiple administrators, and multiple incidents: first at North Hill Elementary School, then at Sylvester Middle School in connection with tract distribution, and again during the Inclusion Assembly.

325. The District was repeatedly placed on actual notice that its officials were treating J.H.'s religious expression differently from comparable secular expression.

326. Plaintiffs' counsel sent written demand letters identifying these constitutional violations, and the District previously acknowledged the governing principles of neutrality toward religion, avoidance of discrimination against religious viewpoints, and equal treatment of student religious expression.

327. Despite that notice and its prior written agreement, the District failed to repudiate McEwen's discriminatory statement, failed to correct the disparate treatment of J.H.'s religious expression, failed to train or direct staff to provide equal treatment to religious objections, and failed to ensure that religious students would be afforded the same opportunities and accommodations available to students asserting secular viewpoints or objections.

328. The District's conduct therefore constitutes intentional religious discrimination, selective enforcement, and unequal treatment under the First and Fourteenth Amendments.

329. The pattern confirms religious targeting. The District did not merely apply neutral school rules that incidentally burdened religion. It repeatedly singled out J.H.'s religious exercise

COMPLAINT - Page 39

AMERICAN CENTER FOR LAW & JUSTICE
201 Maryland Ave NE
Washington DC, 20002
(202) 546-8890

for adverse treatment while permitting comparable secular expression, political advocacy, and school-sponsored moral instruction.

330.    McEwen's statement that students may share opinions, but not religious beliefs, makes explicit what the District's course of conduct already demonstrated: Defendants treat religious exercise as categorically less favored than secular expression and secular moral viewpoints.

331.    It also establishes municipal liability because the discrimination was carried out by officials with policymaking authority, was repeated as a persistent and widespread practice, and was ratified by final policymakers after actual notice.

332.    Because Defendants' policies, customs, and practices targeted religious exercise, imposed burdens because of the religious character of J.H.'s conduct, and failed to operate neutrally or generally, strict scrutiny applies.

333.    Defendants have no compelling interest in suppressing J.H.'s student-initiated religious expression, denying her equal access to religious exercise during non-instructional time, or compelling her continued attendance at religiously objectionable moral instruction after she requested an accommodation.

334.    Defendants' actions were not narrowly tailored. Less restrictive alternatives were readily available, including allowing J.H. to distribute religious materials during non-instructional time, allowing her to discuss her faith with willing classmates, applying any student club procedures equally to religious and secular groups, providing advance notice of religiously objectionable programming, and permitting J.H. to leave the Inclusion Assembly once she invoked her religious objection.

COMPLAINT - Page 40

335.    Defendant McEwen is individually liable for this violation for the same reasons set forth above.

336.    The District is liable under § 1983 because this pattern of religious targeting was caused by District policy, custom, practice, ratification, and deliberate indifference.

337.    The District had actual notice of the constitutional problem through the 2022 demand letter, the 2022 written agreement, the March 20, 2026, demand letter, and the June 18, 2026, demand letter.

338.    Despite that notice, the District failed to train or direct staff to treat student religious exercise equally, failed to repudiate the express prohibition on sharing religious beliefs, failed to provide meaningful religious accommodation during the Inclusion Assembly, and defended rather than remedied the violations after the fact.

339.    That course of conduct reflects an official custom or practice of religious discrimination and deliberate indifference to J.H.'s Free Exercise rights.

340.    Plaintiff is entitled to declaratory and injunctive relief, compensatory or nominal damages, and attorneys' fees.

## COUNT VII
### Violation of the Washington State Constitution
### (Wash. Const. art. I)

341.    Plaintiff repeats, realleges, and incorporates by reference all preceding paragraphs as though fully set forth herein.

342.    Plaintiff Jonathan H. brings this claim on behalf of his child J.H.

343.    To establish a violation of Article I, Section 5 of the Washington Constitution, Plaintiff must show that Defendants restricted protected expression based on its content or viewpoint or otherwise burdened expressive activity protected by Washington law.

COMPLAINT - Page 41

AMERICAN CENTER FOR LAW & JUSTICE
201 Maryland Ave NE
Washington DC, 20002
(202) 546-8890

344. Article I, section 5 of the Washington Constitution provides that "[e]very person may freely speak, write and publish on all subjects, being responsible for the abuse of that right."

345. Article I, section 11 of the Washington Constitution provides that "Absolute freedom of conscience in all matters of religious sentiment, belief and worship, shall be guaranteed to every individual, and no one shall be molested or disturbed in person or property on account of religion[.]" It further provides that no person shall be denied any civil right on account of religion.

346. These provisions are at least as protective of expressive freedom as the First Amendment, and the Washington Supreme Court has recognized that they may, in some circumstances, provide greater protection for free expression and religion than their federal counterparts.

347. By prohibiting J.H. from quietly distributing Christian gospel tracts and discussing her faith with willing classmates during non-instructional time, while permitting other students to engage in comparable secular expression, including peer discussion and participation in political protests, Defendants engaged in viewpoint discrimination against J.H.'s protected expression in violation of article I, section 5 of the Washington Constitution.

348. Defendants' prohibition on J.H.'s distribution of religious gospel tracts and discussion of her faith during non-instructional time, and Defendants' compulsion of J.H.'s continued attendance at the Inclusion Assembly over her express religious objection, each substantially burdened J.H.'s absolute freedom of conscience and religious exercise guaranteed by article I, section 11.

349. By compelling J.H.'s continued attendance at and participation in the May 29, 2026, Inclusion Assembly after she personally and explicitly objected and asked to be excused, Defendants further violated J.H.'s right under article I, section 5 to be free from compelled receipt

COMPLAINT - Page 42

AMERICAN CENTER FOR LAW & JUSTICE
201 Maryland Ave NE
Washington DC, 20002
(202) 546-8890

of expression she did not wish to receive.

350.    Defendants' conduct was not justified by any compelling state interest, and Defendants had readily available, less restrictive alternatives that would have accommodated J.H.'s religious exercise, including permitting her quiet distribution of materials during non-instructional time and providing advance notice and an opportunity to opt out of the Inclusion Assembly.

351.    Defendants' conduct was not a reasonable time, place, or manner restriction, was not viewpoint-neutral, and was not narrowly tailored to serve any legitimate governmental interest.

352.    Defendant McEwen is individually liable for both violations described above, for the same reasons set forth in the preceding counts.

353.    Plaintiff is entitled to declaratory and injunctive relief, compensatory damages, and attorneys' fees and costs.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request the following relief:

   i.    Injunctive relief enjoining Defendants, their agents, officials, servants, employees, and any other persons acting on their behalf from discriminating against J.H. for her expression of her religious beliefs and practices, including: (i) prohibiting J.H. from distributing religious gospel tracts and other religious materials to consenting classmates during non-instructional time; (ii) prohibiting J.H. from discussing her faith with willing classmates during non-instructional time; (iii) compelling J.H.'s attendance at, or continued presence within, any school program or assembly containing content that conflicts with her sincerely held religious beliefs, without providing advance written parental notice and a meaningful, non-stigmatizing opportunity to opt out;

COMPLAINT - Page 43

AMERICAN CENTER FOR LAW & JUSTICE
201 Maryland Ave NE
Washington DC, 20002
(202) 546-8890

ii. A declaratory judgment that Defendants' conduct violated and continues to violate Plaintiffs' rights under the First and Fourteenth Amendments to the United States Constitution, including the Free Speech and Free Exercise Clauses, the right of parents to direct the upbringing and religious development of their children, the Equal Protection Clause, and Article I, sections 5 and 11 of the Washington Constitution;

iii. Compensatory or, in the alternative, nominal damages for the violation of Plaintiffs' First and Fourteenth Amendment rights and rights under Article I, sections 5 and 11 of the Washington Constitution;

iv. Plaintiffs' reasonable attorneys' fees, costs, and other disbursements in this action pursuant to 42 U.S.C. § 1988; and

v. All other and further relief to which Plaintiffs may be entitled.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

Dated: July 8, 2026.    Respectfully submitted,

ABIGAIL SOUTHERLAND**
 (TN 026608)
AMERICAN CENTER FOR LAW & JUSTICE
625 Bakers Bridge Avenue
Franklin, TN 37067
Telephone: (615) 599-5572
asoutherland@aclj.org

s/ Nathan J. Moelker
NATHAN J. MOELKER**
 (VA Bar No. 98313)
CHRISTINA A. COMPAGNONE**
 (DC Bar No. 1657929)
LINDSEY BACHMAN**
 (MO Bar No. 63384)
THE AMERICAN CENTER FOR LAW & JUSTICE
201 Maryland Avenue, NE
Washington, D.C. 20002

COMPLAINT - Page 44

AMERICAN CENTER FOR LAW & JUSTICE
201 Maryland Ave NE
Washington DC, 20002
(202) 546-8890

Telephone: (202) 546-8890
Facsimile: (202) 546-9309
nmoelker@aclj.org
ccompagnone@aclj.org

s/ Justin D. Park
JUSTIN D. PARK
Romero Park P.S.
1019 W. James Street, Suite 102
Kent, WA 98032
Telephone: (425) 450-5000
Email: jpark@romeropark.com

**COUNSEL FOR PLAINTIFFS**

**Not admitted in this jurisdiction; application for pro hac vice admission forthcoming

AMERICAN CENTER FOR LAW & JUSTICE
201 Maryland Ave NE
Washington DC, 20002
(202) 546-8890