# Plaintiffs' Exhibit A



February 14, 2022

**VIA EMAIL & FEDEX**

Dr. Susan Enfield, Superintendent
Highline Public Schools
15675 Ambaum Blvd. SW
Burien, WA 98166
206-631-3070
susan.enfield@highlineschools.org

Re:     *North Hill Elementary School's Violation of J▮▮▮ ▮▮▮▮▮▮▮ First Amendment Rights*

Dr. Enfield,

The American Center for Law and Justice ("ACLJ") represents Mr. & Mrs. Jonathan ▮▮▮▮▮▮ on behalf of their minor daughter, Ju▮▮ regarding North Hill Elementary School's decision to prohibit J▮▮ from discussing her faith and distributing Christian tracts to her friends and classmates during non-instructional time while in attendance at North Hill Elementary School ("the School").

By way of introduction, the ACLJ is an organization dedicated to the defense of constitutional liberties secured by law. ACLJ attorneys have argued before the Supreme Court of the United States in a number of significant cases involving the freedoms of speech and religion.[1]

## STATEMENT OF FACTS

J▮▮▮ ▮▮▮▮▮ is a second-grade student at North Hill Elementary School ("the School"). On January 3, 2022, J▮▮ was found crying by her parents and stated that her backpack was searched by Principal Jones, who was looking to confiscate any of her religious tracts or crosses. J▮▮ told

---

[1] *See, e.g., Pleasant Grove City v. Summum*, 129 S. Ct. 1523 (2009) (unanimously holding that the Free Speech Clause does not require the government to accept counter-monuments when it has a war memorial or Ten Commandments monument on its property); *McConnell v. FEC*, 540 U.S. 93 (2003) (unanimously holding that minors enjoy the protection of the First Amendment); *Lamb's Chapel v. Center Moriches Sch. Dist.*, 508 U.S. 384 (1993) (unanimously holding that denying a church access to public school premises to show a film series on parenting violated the First Amendment); *Bd. of Educ. v. Mergens*, 496 U.S. 226 (1990) (holding by an 8-1 vote that allowing a student Bible club to meet on a public school's campus did not violate the Establishment Clause); *Bd. of Airport Comm'rs v. Jews for Jesus*, 482 U.S. 569 (1987) (unanimously striking down a public airport's ban on First Amendment activities).

her parents that she has been trying to evangelize to her classmates during recess, but always asks first whether they want to talk to her about God. She also stated that children liked the cross as a present and kept asking her for them.

On January 4, 2022, Mrs. ████ witnessed Ju██ backpack being searched as she entered the school building and Mrs. ████ immediately asked why the principal was doing such a thing. Principal Jones stated that she has unsuccessfully been trying to contact the ████ because parents were complaining that their children were receiving religious tracts and crosses from Ju██ Mr. & Mrs. ████ asked J██ about other instances happening at school, and she stated that the para-educator, Peggy Edwards, had sent J██ to the Principal's office **at least 10 times** since December 2021 because J██ was evangelizing during recess.

On January 5, 2022, and for the next two days, Principal Jones asked Mrs. ████ whether Ju██ backpack contained any tracts or crosses.

On January 31, 2022, J██ was again sent to the Principal's office and Principal Jones sent a text message to Mr. ████ stating:

> Jon- There was a situation at recess that my counselor and I spoke to J██ about. I would like to talk with you about it and then we can decide how to move forward. Please let me know a time that works for you or call the main office and they will see if I am not with students or staff.
> Thank you and talk to you soon.
> Kimberly Jones

Mr. ████ was in communication with Principal Jones from January 31, 2022 through February 2, 2022, where Principal Jones explained that J██ had been talking about God and Hell at school, as well as passing out religious tracts and crosses. Mr. ████ provided the ACLJ's informational memorandum to request that the School allow J██ to practice her First Amendment rights. Principal Jones agreed that J██ only evangelizes to students after she asks their permission to talk with them about God and receives a yes. She stated that J██ can continue to evangelize as long as she asks permission first, but was adamant that J██ cannot pass out religious tracts or crosses. When Mr. ████ asked for further clarification on the reasoning for this prohibition, Principal Jones sent him an email citing to District policy:

> Mr. ████ – Thanks for the question about your student who has been distributing things on campus.  I was able to receive more guidance on the exact policy and procedure. Generally this is governed by Policy and Procedure 3220.  Since what is being distributed is not a "student publication" (aka student newspaper, for those of us who are old school) but rather items and tracts, the section of the policy that is most important is the "Distribution of Materials" section, which states that students may distribute things but only under the rules set forth in the procedure.
> The procedure then goes on to say that distribution cannot:
> · Cause a disruption or interfere with school activities
> And that if there is disruption or interference a student will be subject to corrective action.

Please let me know if you have any further questions
Kimberly Jones

As will be explained below, neither the law under the First Amendment nor the District's policy on the freedoms of expression support the School's prohibition on the distribution of private religious items, including Ju█ religious tracts. Accordingly, the School's decision presents a matter of great constitutional concern to the ACLJ. The prohibition against the mere discussion of God or the giving of an item displaying a religious reference to a friend and classmate blatantly interferes with Ju█ First Amendment rights as a student.

### STATEMENT OF LAW

**I.      STUDENTS, INCLUDING JU█ ENJOY THE RIGHT TO ENGAGE IN PRIVATE SPEECH AND EXPRESSION WHILE IN ATTENDANCE AT PUBLIC SCHOOLS.**

It is well-settled law that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Community Sch. Dist.*, 393 U.S. 503, 506 (1969). As the Supreme Court has noted,

> School officials do not possess absolute authority over their students. Students in school as well as out of school are persons under our Constitution. They are possessed of fundamental rights which the state must respect, just as they themselves must respect their obligations to the state. In our systems, students may not be regarded as closed-circuit recipients of only that which the state chooses to communicate. They may not be confined to the expressions of those sentiments that are officially approved.

*Id.* at 511. While school officials may apply "reasonable regulation[s] [to] speech-connected activities in carefully restricted circumstances," they may not censor student expression unless the speech "impinge[s] upon the rights of others" or creates a material and substantial disruption to the school's ability to fulfill its educational goals. *Id.* at 509, 513. The law is quite clear, however, that "undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." *Id.* at 508.

In cases involving student-initiated speech, *Tinker* provides the appropriate standard for reviewing speech and its suppression by school officials. *See also Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988) (reaffirming *Tinker* as the proper standard for student-initiated speech by distinguishing school-sponsored speech from student-initiated speech). In the case at hand, the decision to prohibit J█ from handing out her religious tracts is patently unreasonable and cannot stand under *Tinker.* As the Supreme Court stated,

> Boards of Education . . . have, of course, important, delicate, and highly discretionary functions, but none that they may not perform within the limits of the Bill of Rights. That they are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to

3

strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes.

*Tinker,* 393 U.S. at 507 (quoting *West Virginia v. Barnette*, 319 U.S. 624, 637 (1943)).

Again, concern that a substantial disruption *could* occur as a result of permitting students to exercise their First Amendment rights is an insufficient reason to restrict student speech:

But, in our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression. Any departure from absolute regimentation may cause trouble. Any variation from the majority's opinion may inspire fear. Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance. *But our Constitution says we must take this risk . . . .*

*Id.* at 508-09 (citing *Terminiello v. Chicago*, 337 U.S. 1 (1949) (emphasis added). Thus, school officials must be able to affirmatively establish that they have a substantial reason to interfere with Jul█ First Amendment rights:

In the absence of a specific showing of constitutionally valid reasons to regulate their speech, students are entitled to freedom of expression of their views. As Judge Gewin, speaking for the Fifth Circuit, said, school officials cannot suppress "expressions of feelings with which they do not wish to contend."

*Id.* at 511 (quoting *Burnside v. Byars*, 363 F.2d 744, 749 (5ᵗʰ Cir. 1966)).

Moreover, J█ possesses her constitutional rights throughout the school day:

A student's rights, therefore, do not embrace merely the classroom hours. When he is in the cafeteria, or on the playing field, or on the campus during the authorized hours, he may express his opinions, even on controversial subjects . . . if he does so without "materially and substantially interfer[ing] with the requirements of appropriate discipline in the operation of the school" and without colliding with the rights of others.

*Id.* at 512-13 (quoting *Burnside v. Byars*, 363 F.2d at 749).

## II.    J█ POSSESSES THE RIGHT TO DISTRIBUTE OTHERWISE PERMITTED ITEMS ON PUBLIC SCHOOL PROPERTY, EVEN IF THEY ARE RELIGIOUS IN NATURE.

Within *Tinker*'s framework, students are free to express their religious views while at school. Such expression includes sharing a Bible or an invitation to an event that contains Bible verses or religious references with other students who are willing recipients of such a gift or invitation. It is well settled that religious speech is protected by the First Amendment and may not be singled out for disparate treatment. *See Good News Club*, 533 U.S. 98; *Rosenberger*, 515 U.S.

4

819; *Pinette*, 515 U.S. 7532; *Mergens,* 496 U.S. 226; *Widmar v. Vincent*, 454 U.S. 263, 269 (1981) (citing *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640 (1981); *Neimotko v. Maryland,* 340 U.S. 268 (1951); *Saia v. New York,* 334 U.S. 558 (1948)).[2]

The First Amendment precludes any government effort to single out and censor or otherwise burden the speech of private parties solely because that speech is religious. *See Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 543 (1993) ("[t]he principle that government, in pursuit of legitimate interests, cannot in a selective manner, impose burdens only on conduct motivated by religious belief is essential to the protection of the rights guaranteed by the Free Exercise Clause."); *Rosenberger*, 515 U.S. at 828 (noting that "the government may not regulate speech based on its substantive content or the message it conveys" and that "in the realm of private speech or expression, government regulation may not favor one speaker over another.") Indeed, "discrimination against speech because of its message is presumed to be unconstitutional. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger,* 515 U.S. at 828.

Importantly, concerns relating to compliance with the Establishment Clause are invalid here. "[T]here is a crucial difference between *government* speech endorsing religion, which the Establishment Clause forbids, and *private* speech endorsing religion, which the Free Speech and Free Exercise Clauses protect." *Mergens*, 496 U.S. at 250. "The proposition that schools do not endorse everything they fail to censor is not complicated." *Id.* As one federal court of appeals has noted, "[t]he Supreme Court has . . . rejected the view that, in order to avoid the perception of sponsorship, a school may suppress religious speech." *Muller by Muller v. Jefferson Lighthouse Sch.*, 98 F.3d 1530, 1544 (7th Cir. 1996) (citing *Widmar v. Vincent*, 454 U.S. 263, 271-73 (1981)); *Mergens*, 496 U.S. at 247-52; *Lamb's Chapel*, 508 U.S. 384).

Consistent with the law, a public school that receives federal funding must certify "that it has no policy that prevents, or otherwise denies participation in constitutionally protected prayer in public schools" as set forth in the U.S. Department of Education (hereinafter "DOE") Secretary's *Guidance on Constitutionally Protected Prayer in Public Elementary and Secondary Schools* ("*Guidance*").[3] A school that receives federal funding, yet fails to make such a certification or makes the certification in bad faith, could lose its federal funding "until the recipient [school] comes into compliance."[4]

---

[2] The Supreme Court has clearly stated the importance of the preservation of *private religious* speech. *See Pinette*, 515 U.S. at 760 ("Our precedent establishes that private religious speech, far from being a First Amendment orphan, is as fully protected under the Free Speech Clause as secular private expression . . . Indeed, in Anglo-American history, at least, government suppression of speech has so commonly been directed precisely at religious speech that a free-speech clause without religion would be Hamlet without the prince.").

[3] U.S. Dept. of Educ., *Guidance on Constitutionally Protected Prayer in Public Elementary and Secondary Schools,* 68 F.R. 9646 (Feb. 28, 2003) (hereinafter, "Guidance"), *available at* http://www.ed.gov/policy/gen/guid/religionandschools/prayer_guidance.html.

[4] *Id*. (citing Section 9524 of the Elementary and Secondary Educ. Act of 1965 as amended by the No Child Left Behind Act of 2001).

The DOE has issued guidelines to assist school officials in the proper treatment of student religious expression. For example, guidelines from 1995 further address students' rights to share their faith with others:

> Religious literature: Students have a right to distribute religious literature to their schoolmates on the same terms as they are permitted to distribute other literature that is unrelated to school curriculum or activities. Schools may impose the same reasonable time, place, and manner or other constitutional restrictions on distribution of religious literature as they do on nonschool literature generally, but they may not single out religious literature for special regulation.[5]

In 2020, the DOE reiterated this guideline and added the following provision:

> Prayer During Non-instructional Time: Students may pray when not engaged in school activities or instruction, subject to the same rules designed to prevent material disruption of the educational program that are applied to other privately initiated expressive activities. Among other things, students may read their Bibles, Torahs, Korans, or other scriptures; say grace before meals; and pray or study religious materials with fellow students during recess, the lunch hour, or other non-instructional time to the same extent that they may engage in nonreligious activities. While school authorities may impose rules of order and pedagogical restrictions on student activities, they may not discriminate against student prayer or religious perspectives in applying such rules and restrictions.[6]

## III.    SCHOOL OFFICIALS HAVE NO VALID BASIS FOR PROHIBITING JUL█ TRACTS AND CROSSES DURING NON-INSTRUCTIONAL TIME.

The Board Policy on Freedom of Expression in the Schools states that "[s]tudents may express oral, written or illustrative opinions on school premises, school activities, or transportation so long as it does not materially and substantially disrupt the operation of the school," and "[a] school official must base a forecast of material and substantial disruption on specific facts, including past experience in the school and current events influencing student behavior, and not on undifferentiated fear or apprehension."[7] Jul█ right to express her religious views, whether verbally or through giving a Bible or other religious tract to her friends and classmates, is fully protected by the First and Fourteenth Amendments to the United States Constitution. Importantly, complaints about the content of a student's speech, alone, does "not rise to the level of a 'disruption' much less a 'material or substantial interference'" warranting censorship or suppression of the student's speech. *K.D. v. Fillmore Central School District*, 2005 U.S. Dist. LEXIS 33871, at 21 (W.D.N.Y. 2005) (upholding student's right to wear a t-shirt proclaiming that

---

[5] U.S. Dept. of Educ., *Religious Expression in Public Schools* (1995), *available at* http://www.ed.gov/Speeches/08-1995/religion.html.

[6] U.S. Dept. of Educ., *Guidance on Constitutionally Protected Prayer in Public Elementary and Secondary Schools*, 68 Fed. Reg. 9645 (Jan. 16, 2020), *available at*
https://www2.ed.gov/policy/gen/guid/religionandschools/prayer_guidance.html.

[7] *Highline Public Schools Board Policies, Procedure 3220, available at*
https://www.highlineschools.org/about/board-policies/policy-details/~board/board-policies/post/procedure-3220-freedom-of-expression.

"Abortion is Homicide" despite student complaints that they found the message offensive and disruptive).

Furthermore, the section cited by Principal Jones in support of her prohibition of Jul██ religious tracts is inapplicable here as it specifically applies only to assembly and classroom settings. This section provides:

> A. Distribution of written materials or presentation of an oral speech *in an assembly or classroom setting* may be restricted:
>
> 1.Where there is evidence which reasonably supports a forecast that the expression is likely to cause material and substantial disruption of, or interference with, school activities, which disruption or interference cannot be prevented by reasonably available, less restrictive means; Consequently, her views may not be suppressed simply because they are religious.[8]

Whereas the general policy on the distribution of written materials *outside* of the classroom setting in Section B limits distribution on when it is "in violation of district policies regarding patently *lewd, vulgar, and indecent conduct* or communication." J██ has only handed out religious tracts during student free time at recess, and the materials certainly do not contain anything that is lewd, vulgar, or indecent. Consequently, Principal Jones misapplied the School's policy when she stated that religious tracts handed out during recess are prohibited if they "cause a disruption or interference with school activities," and Jul██ materials may not be suppressed simply because they are religious.

Principal Jones' decision was that J██ cannot hand out any religious materials on school property. She then proceeded by repeatedly searching Jul██ backpack to remove religious tracts every morning J██ entered the school. To add to the humiliation, J██ was publicly scolded and sent to Principal Jones' office ten times or more after exercising her protected First Amendment rights during recess. Tellingly, Principal Jones stated no reason for her decision other than that the religious nature of Jul██ materials upset parents, and even admitted that J██ was asking students' permission before evangelizing or handing them tracts. The decision to prohibit J██ from distributing her religious materials violates Jul██ First Amendment rights.

In the case at hand, the actions of the school officials involved were particularly egregious, especially in light of the school's Freedom of Expression Policy which expressly documents the rights that students have to distribute materials on campus under the First Amendment. It is disconcerting that Jul██ tracts have been singled out solely for their religious content as such treatment blatantly violates the First Amendment. But more importantly, it is alarming that North Hill Elementary School would violate Jul██ right to privacy to the extent that they searched and seized her backpack every morning, publicly disgracing her.

---

[8] *Id.*

**DEMAND**

The situation described herein is of serious importance, not just to Ju▮▮ but to all students attending North Hill Elementary School who are entitled to the full protection of their First Amendment liberties. As you are undoubtedly aware, the violation of an individual's constitutional rights, even for a moment, results in irreparable injury. *Elrod v. Burns,* 427 U.S. 347, 373 (1976).

Given the nature of the rights involved, we request your immediate written assurances that North Hill Elementary School officials will comply with the requirements of the First Amendment, by permitting J▮▮ to distribute her religious tracts to her classmates and discuss her faith during non-instructional time, without further interference from school officials. We trust that this matter can be resolved swiftly and that the ▮▮▮▮ option of taking legal action will not be necessary. Please direct your response to me in writing or by phone by **Monday, March 14, 2022**.

Thank you for your prompt attention to this important matter.

Sincerely,

*Christina Compagnone*

Christina (Stierhoff) Compagnone*
Associate Counsel
**American Center for
Law & Justice**
201 Maryland Ave NE
Washington, DC 20001
Direct: (202) 641-9168
ccompagnone@aclj.org

*\* Admitted to practice law in Virginia and the District of Columbia*

8

# Plaintiffs' Exhibit B



**Educational Resource and Administrative Center**

15675 Ambaum Boulevard Southwest
Burien, Washington 98166

**highlineschools.org**
**206.631.3001**

March 8, 2022

<u>**VIA EMAIL**</u>

Christina (Stierhoff) Compagnone
Associate Counsel, Am. Ctr. for L. and Justice
201 Maryland Ave NE
Washington, DC 20001
ccompagnone@aclj.org

**Re:    Distribution of materials at North Hill Elementary School**

Dear Ms. Compagnone:

Highline Public Schools received your letter dated February 14, 2022. The District appreciates the opportunity to address the concerns you raised as it resolves the situation that recently arose at North Hill Elementary School involving J.H. As explained below, the District intends to allow J.H. to distribute religious tracts at school going forward subject to certain limitations. The District considers this a proper resolution of the particular circumstances presented that balances all relevant interests at stake consistent with applicable law.

This situation arose late last year as J.H. began expressing to staff her worry that peers will go to hell because they do not listen to her, along with her concern about the fate of her own soul if she cannot help them—to the point of crying from grief. Around the same time, J.H. was observed chasing another student to share scripture with them, standing on a picnic table shouting to students "Be saved or you are going to hell!," and getting into a disagreement with another student over her proselytizing. J.H. also began distributing pamphlets and other items to students. As a result of J.H.'s actions, several second grade students were scared and upset, especially as a result of the threats of going to hell, and some expressly stated to staff that they did not want to talk with J.H. about God at school.

To manage this emerging situation, District staff spoke with J.H. about it being unsafe to climb onto tables (regardless of the purpose of the climbing), not threatening other students that they are going to hell, and making sure other students want to speak with her when she proselytizes to them. In an attempt to avoid further disruption and to get a handle on the situation, staff also asked J.H. to cease distributing religious materials and items to other students. On one occasion, when this direction was first given, J.H. consented to a search of her bag to confirm she had no materials to distribute at that time. The school principal spoke with J.H.'s parents about all these concerns.



**Educational Resource and Administrative Center**

15675 Ambaum Boulevard Southwest
Burien, Washington 98166

**highlineschools.org**
**206.631.3001**

The District has now had an opportunity to fully assess this situation, including the concerns raised in your letter, and to determine an appropriate path forward. As reflected in its policies and procedures, the District agrees with the core principles raised in your letter of governmental neutrality to religion, avoidance of discrimination against religious viewpoints, and allowing students to express themselves at school, including potentially through the distribution of written materials. At the same time, the District must sometimes restrict student expression to avoid undue interference or disturbance—especially at the elementary school level. *See, e.g., Frudden v. Pilling*, 742 F.3d 1199, 1205 n.3 (9th Cir. 2014) (noting "the elementary school context may be relevant" to consideration of restrictions on expression); *Muller by Muller v. Jefferson Lighthouse Sch.*, 98 F.3d 1530, 1539-40 (7th Cir. 1996) (noting "the delicate custodial and tutelary environment of an elementary school" (cleaned up)). This may include protecting young students from undue confusion, trauma, threats, or exposure to content that is clearly beyond their level of maturity, or otherwise preventing interference with education. *See, e.g., Muller*, 98 F.3d at 1540 ("In a public forum, the Christian can tell the Jew he is going to hell, or the Jew can tell the Christian he is not one of God's chosen, no matter how that may hurt. But it makes no sense to say that the overly zealous Christian or Jewish child in an elementary school can say the same thing to his classmate, no matter the impact.").

In light of all the above, the District will allow J.H. to distribute materials at school going forward, including religious materials. But this will be subject to certain neutral limitations, which will apply equally to J.H. and any other students distributing materials at the school, in order to prevent undue interference or disturbance. In particular, the District may intervene if any of the following situations arises:

- The materials threaten to cause student trauma, or otherwise fall clearly outside the maturity level of the students involved.

- The materials are obscene or profane.

- Distribution would violate District policies against harassment, intimidation, or bullying.

- One student disregards another student's stated preferences or boundaries for being offered or provided written materials.

- A substantial disruption or reasonable forecast of substantial disruption of classroom education or other school operations.

These same limitations will apply more broadly to interactive expression among students at the school, including proselytizing; will apply equally to all students; and will apply without regard for particular viewpoints, including religious ones.

The District considers this an appropriate resolution to this situation that balances all the relevant interests at stake. J.H.'s principal plans to speak with her family directly to explain these parameters and to address any remaining concerns they might have. We hope and expect that this will resolve the matter.



**Educational Resource and Administrative Center**

15675 Ambaum Boulevard Southwest
Burien, Washington 98166

**highlineschools.org**
**206.631.3001**

Our one respectful request to you is that you remove or revise your March 2, 2022 article and related petition from ACLJ's website. The article contains significant factual inaccuracies, fails to reflect the school principal's good faith efforts to address this delicate situation, and has resulted in a growing number of hostile and unproductive messages directed at her and the District.

Thank you again, we appreciate your perspective on these issues.

Sincerely,

Holly Ferguson, J.D.
Chief Policy & Strategy Officer
Highline Public Schools

# Plaintiffs' Exhibit C



March 20, 2026

**VIA EMAIL & FEDEX**

Dr. Ivan Duran, Superintendent
Highline Public Schools
15675 Ambaum Blvd. SW
Burien, WA 98166
206-631-3070
Ivan.duran@highlineschools.org

  ***Re: Sylvester Middle School's Violation of J███ ██████ First Amendment Rights***

Dr. Duran,

  The American Center for Law and Justice ("ACLJ") represents Mr. & Mrs. Jonathan ████ on behalf of their minor daughter, Ju██ regarding the decision to prohibit J██ from discussing her faith and distributing Christian tracts to her friends and classmates during non-instructional time while in attendance at Sylvester Middle School ("the School"). This is the second time it has been necessary for the ACLJ to send a letter to you; this same prohibition took place at North Hill Elementary School several years ago. We have attached to this letter our previous demand letter and the previous agreement that we reached with your district, an agreement that has now been breached.

  By way of introduction, the ACLJ is an organization dedicated to the defense of constitutional liberties secured by law. ACLJ attorneys have argued before the Supreme Court of the United States in a number of significant cases involving the freedoms of speech and religion.[1]

## STATEMENT OF FACTS

  For several years, J███ ██████ has engaged in quiet, student-initiated religious expression at school by offering Christian gospel tracts to fellow students during non-instructional time. J██

---

[1] *See, e.g., Pleasant Grove City v. Summum*, 129 S. Ct. 1523 (2009) (unanimously holding that the Free Speech Clause does not require the government to accept counter-monuments when it has a war memorial or Ten Commandments monument on its property); *McConnell v. FEC*, 540 U.S. 93 (2003) (unanimously holding that minors enjoy the protection of the First Amendment); *Lamb's Chapel v. Center Moriches Sch. Dist.*, 508 U.S. 384 (1993) (unanimously holding that denying a church access to public school premises to show a film series on parenting violated the First Amendment); *Bd. of Educ. v. Mergens*, 496 U.S. 226 (1990) (holding by an 8-1 vote that allowing a student Bible club to meet on a public school's campus did not violate the Establishment Clause); *Bd. of Airport Comm'rs v. Jews for Jesus*, 482 U.S. 569 (1987) (unanimously striking down a public airport's ban on First Amendment activities).

obtains these tracts in batches from the Gospel House Tract Society and distributes them during breaks and lunch. Consistent with an agreement previously reached with school officials during her time at North Hill Elementary School (also in the Highline School District), J███ asks each student for consent before offering a tract. She does not impose materials on anyone who does not wish to receive them.

That prior agreement, attached, was signed by Holly Ferguson, Chief Policy & Strategy Officer for the Highline Public Schools. In this letter, the District agreed with our letter's statements regarding "government neutrality to religion, avoidance of discrimination against religious viewpoints, and allowing students to express themselves at school, including potentially through the distribution of religious materials." The District also expressly agreed to allow our client "to distribute materials at school going forward, including religious materials." That agreement has now been breached.

On or about February 18, 2026, while J███ was attending her math class at Sylvester Middle School, Vice Principal Lori McEwen entered the classroom, removed J███ from class, and told her that she was not permitted to distribute religious gospel tracts at school. When J███ asked why other students are allowed to express their viewpoints while she is not, Vice Principal McEwen drew an explicit and constitutionally impermissible distinction: she told J███ that students may share opinions, but they may not share religious beliefs.

Vice Principal McEwen specifically pointed to the school's permission for students to leave campus during school hours to participate in anti-ICE protests as an example of permissible expression, while simultaneously maintaining that Ju███ distribution of religious literature is not permitted. These events make plain that the District is applying a double standard — secular and political expression is welcomed, while religious expression is singled out for suppression.

During the same encounter, J███ asked whether she could start a Christian student club. Vice Principal McEwen told her that she could, but that the club would be required to have a teacher sponsor. This statement misrepresents the applicable legal and policy framework.

The prohibition against the mere discussion of God or the giving of an item displaying a religious reference to a friend and classmate blatantly interferes with Ju███ First Amendment rights as a student.

## STATEMENT OF LAW

**THE FIRST AMENDMENT**

It is well-settled law that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Community Sch. Dist.*, 393 U.S. 503, 506 (1969). While school officials may apply "reasonable regulation[s] [to] speech-connected activities in carefully restricted circumstances," they may not censor student expression unless the speech "impinge[s] upon the rights of others" or creates a material and substantial disruption to the school's ability to fulfill its educational goals. *Id.* at 509, 513. The law is quite

clear, however, that "undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." *Id.* at 508.

Within *Tinker*'s framework, students are free to express their religious views while at school. Such expression includes sharing a Bible or an invitation to an event that contains Bible verses or religious references with other students who are willing recipients of such a gift or invitation. It is well settled that religious speech is protected by the First Amendment and may not be singled out for disparate treatment. *See Good News Club*, 533 U.S. 98; *Rosenberger*, 515 U.S. 819; *Mergens*, 496 U.S. 226; *Widmar v. Vincent*, 454 U.S. 263, 269 (1981).

Viewpoint discrimination, treating speech less favorably because of the particular perspective it expresses, is among the most egregious forms of content-based restriction and is subject to strict scrutiny. Here, the District's own officials have articulated a policy of viewpoint discrimination with unusual candor. Vice Principal McEwen explicitly told J█████ that students may share opinions but not religious beliefs. She then contrasted political protest — which the school permits and apparently facilitates by allowing students to leave campus during school hours — with Jul█████ religious expression, which she forbade. This is not a close case. The school has opened a forum for student expression during non-instructional time and has selectively excluded a religious viewpoint from that forum.

The First Amendment precludes any government effort to single out and censor or otherwise burden the speech of private parties solely because that speech is religious. *See Rosenberger*, 515 U.S. at 828 (noting that "the government may not regulate speech based on its substantive content or the message it conveys" and that "in the realm of private speech or expression, government regulation may not favor one speaker over another."). Indeed, "discrimination against speech because of its message is presumed to be unconstitutional. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Id.*

Importantly, concerns relating to compliance with the Establishment Clause are invalid here. "[T]here is a crucial difference between *government* speech endorsing religion, which the Establishment Clause forbids, and *private* speech endorsing religion, which the Free Speech and Free Exercise Clauses protect." *Mergens*, 496 U.S. at 250.

The DOE has issued guidelines to assist school officials in the proper treatment of student religious expression. It issued new guidance on prayer in schools where it reiterated:

> public schools cannot subject religious speech, including prayer, to more onerous restrictions than similar secular speech. That is, a school may not discriminate against religious expression by subjecting it to different restrictions than it imposes on secular expression. If a student wanted to pray with a classmate during a time when students were permitted to talk amongst themselves, a teacher would not be entitled to require the praying students to stop or step outside.[2]

---

[2] U.S. Dept. of Educ., *Guidance on Constitutionally Protected Prayer in Public Elementary and Secondary Schools*, (Feb. 5, 2026), *available at* https://www2.ed.gov/policy/gen/guid/religionandschools/prayer_guidance.html.

3

Even the Board Policy on Freedom of Expression in the Schools states that "[s]tudents may express oral, written or illustrative opinions on school premises, school activities, or transportation so long as it does not materially and substantially disrupt the operation of the school," and "[a] school official must base a forecast of material and substantial disruption on specific facts, including past experience in the school and current events influencing student behavior, and not on undifferentiated fear or apprehension."[3] In sum, the District's conduct constitutes a clear and serious violation of Ju▮▮ First Amendment rights. By permitting secular and political expression — including students leaving campus to engage in anti-ICE protests during school hours — while simultaneously forbidding J▮▮ from quietly distributing religious tracts to consenting classmates during non-instructional time, school officials have engaged in the paradigmatic form of viewpoint discrimination the Constitution forbids. The District cannot identify any material and substantial disruption caused by Ju▮▮ consent-based, student-initiated religious expression, and its own Board Policy demands more than undifferentiated concern about the content or viewpoint of a student's speech. Nor may the District invoke the Establishment Clause as a shield: the Supreme Court has made abundantly clear that permitting private student religious expression is not only constitutionally permissible, it is constitutionally required. *See Good News Club*, 533 U.S. at 107; *Mergens*, 496 U.S. at 250. The District's actions are unlawful and must be corrected immediately.

**THE EQUAL ACCESS ACT**

Congress enacted the Equal Access Act "to address perceived widespread discrimination against religious speech in public schools." *Westside Bd. of Educ. v. Mergens*, 496 U.S. 226, 239 (1990). Congress's stated purpose of the Act included "[Public secondary schools may not discriminate against] any students who wish to conduct a meeting . . . on the basis of religious, political, philosophical, or other content of the speech at such meetings." 20 U.S.C. § 4071(a) (2006). Religious groups must be allowed to meet on campus without school officials censoring their religious beliefs or statements. In *Mergens*, a case argued by ACLJ Chief Counsel Jay Sekulow, the Supreme Court upheld the Equal Access Act as constitutional and explained that the Establishment Clause, rather than requiring the exclusion of religious clubs, mandates that government be neutral with respect to religion: "[I]f a State refused to let religious groups use the facilities open to others, then it would demonstrate not neutrality but hostility toward religion." *Mergens*, 496 U.S. at 248 (quoting *McDaniel v. Paty*, 435 U.S. 618, 641 (1978) (Brennan, J., concurring in judgment)). The Supreme Court's holding in *Mergens* affirms that schools must afford religious clubs the same privileges as other clubs on campus.

Highline School District receives federal financial assistance, and Sylvester Middle School maintains a limited open forum. Accordingly, the Equal Access Act compels the school to permit J▮▮ to form and operate a Christian student club on the same terms applicable to other non-curriculum-related student groups.

With respect to the faculty sponsor requirement: the Equal Access Act provides that school employees may be present at student religious group meetings only in a non-participatory, custodial capacity. 20 U.S.C. § 4071(c)(3). The school may not require a teacher to "sponsor" or

---

[3]     *Highline    Public    Schools    Board    Policies,    Procedure    3220*,    *available    at* https://www.highlineschools.org/about/board-policies/policy-details/~board/board-policies/post/procedure-3220-freedom-of-expression.

endorse a religious student group as a precondition of its recognition. Such a requirement would violate the Establishment Clause. Furthermore, the District's own student activities policy, Policy 2153, does not require students to independently recruit a willing teacher sponsor — rather, it provides that the Principal shall assign a faculty monitor where one is needed, stating expressly: "The principal shall be responsible for the assignment of a room and for the approval and/or assignment of a staff member to monitor the meeting."

**DEMAND**

The situation described herein is of serious importance, not just to Ju███ but to all students attending the School who are entitled to the full protection of their First Amendment liberties. As you are undoubtedly aware, the violation of an individual's constitutional rights, even for a moment, results in irreparable injury. *Elrod v. Burns,* 427 U.S. 347, 373 (1976).

Given the nature of the rights involved, we request your immediate written assurances that School officials will comply with the requirements of the First Amendment, by permitting J███ to distribute her religious tracts to her classmates and discuss her faith during non-instructional time, without further interference from school officials. We also demand confirmation of Ju███ right to form and operate a Christian student club on the same terms and conditions applicable to all other non-curriculum-related student groups. We trust that this matter can be resolved swiftly and that the ████████ option of taking legal action will not be necessary. Please direct your response to me in writing by Friday, March 27, 2026.

Thank you for your prompt attention to this important matter.

Sincerely,

*Nathan Jeremiah Moelker*

Nathan Moelker**
Senior Associate Counsel
Christina Compagnone*
Senior Managing Counsel
**American Center for
Law & Justice**
201 Maryland Ave NE
Washington, DC 20002
nmoelker@aclj.org

* *Admitted to practice law in Virginia and the District of Columbia*
** *Admitted in Virginia*

5

# Plaintiffs' Exhibit D



Educational Resource and Administrative Center

15675 Ambaum Boulevard Southwest
Burien, Washington 98166

**highlineschools.org**
**206.631.3001**

March 27, 2026

Nathan Moelker                                                  *Via Email*
American Center for Law & Justice
201 Maryland Ave NE
Washington, DC 20002
nmoelker@aclj.org

Mr. Moelker,

Thank you for your recent letter dated March 20, 2026. We appreciate the opportunity to address the concerns that you have raised. I want to state that Highline Public Schools is committed to supporting student free expression, subject to appropriate school and district policies. Regarding student J.H., the facts are not precisely how they are portrayed in your letter.

J.H. was distributing religious tracts before school in the cafeteria, which is permitted. On the day in question Assistant Principal McEwen entered the classroom to confirm that J.H. knew that distribution during class is not permitted. During instructional time the expectation is that students are focused on instruction and activities happening in class, not distributing personal materials. I should note that it was J.H., not Assistant Principal McEwen, who made a comparison to the student walkout. Furthermore, Assistant Principal McEwen did not tell the student that students could not express their religious beliefs.

J.H. may certainly distribute her materials during non-instructional times such as before and after school and during lunch. However, distribution during class is not permitted. We appreciate that she asks other students for their permission and does not engage further if a student indicates that they do not wish to receive her information.

With respect to the school club, all clubs at Sylvester have a staff member assigned to them. In the case of a religious club the staff member does not participate in the content or activities of the club, but is there to provide supervision, support students with logistics, and other such activities. In fact, school staff act in a manner exactly as described in your letter—they are there in a "non-participatory, custodial capacity". Should J.H. continue to have an interest in starting a club she can follow the school's process to do so.

While we appreciate your organization's dedication to the "defense of constitutional liberties secured by law", we also respectfully note that the family has not approached the school to discuss their concerns regarding this matter. We strongly urge families to work directly with their school to resolve matters such as this.

Sincerely,

Holly Ferguson
Chief Policy & Strategy Officer
Highline Public Schools

cc: Dr. Ivan Duran, Superintendent

# Plaintiffs' Exhibit E



June 18, 2026

**VIA EMAIL & FEDEX**

Dr. Ivan Duran, Superintendent
Highline Public Schools
15675 Ambaum Blvd. SW
Burien, WA 98166
206-631-3070
Ivan.duran@highlineschools.org

   ***Re:  Sylvester Middle School's Violation of J███   First Amendment Rights***

Dr. Duran,

   The American Center for Law and Justice ("ACLJ") represents Mr. & Mrs. Jonathan ███ on behalf of their minor daughter, Ju███ regarding the compelled violation of her fundamental rights while in attendance at Sylvester Middle School ("the School"). On May 29, 2026, Sylvester Middle School compelled Ju███ and every other student in the school—to attend a mandatory school-wide assembly titled the "Inclusion Assembly." When Ju███ acting on sincere religious conviction, expressed discomfort and sought to be excused, a teacher denied her that right, telling her expressly that she had "no other choice" but to remain. J███ was thereafter forced to sit through content that directly conflicted with her sincerely held religious beliefs, weeping through the remainder of the assembly and carrying that distress into her subsequent classes. The District's conduct on that day violated Ju███ rights under the Free Speech Clause, the Free Exercise Clause, the Establishment Clause, and the Due Process Clause of the First and Fourteenth Amendments to the United States Constitution. This is the third time it has been necessary for the ACLJ to send a letter to you; twice our clients' rights were violated by this District's prohibition of our client's right to engage in quiet, student-initiated religious expression, and now her rights have been violated even more egregiously. This will be our final letter.

## STATEMENT OF FACTS

   On May 29, 2026, at approximately 12:20 p.m., the entire student body of Sylvester Middle School was required to attend an "Inclusion Assembly" organized by the School. The assembly was led principally by Mr. Jeremy, a teacher who supervises the lunch period, with several older students also addressing the full student body and describing in detail their sexual identities. The Vice Principal was present in the gym and observed the proceedings.

The assembly covered a range of inclusion topics, including racial diversity, disability, and women's rights. The second portion of the assembly, however, was dedicated to LGBTQ+ content and included a presentation covering 72 gender identities, a discussion of sexual orientations including binary, transgender, and asexual identities, explicit affirmations such as "happy pride month," and the display of various pride flags. The assembly included instruction to the effect that students should include and befriend LGBTQ+ individuals.

J███ holds sincere religious beliefs, grounded in her Christian faith, regarding human sexuality and gender. The content of the assembly's LGBTQ+ portion was directly contrary to those beliefs. During the assembly, J██ approached her advisory teacher, Ms. Holmes, and told her that she did not feel comfortable. Rather than being permitted to step out on that basis, Jul██ discomfort was concealed from the assembly organizers: Ms. Holmes and another teacher, Ms. Edwards, told those in charge of the assembly that J██ needed to use the restroom, so that J██ could briefly exit without disclosing her religious objection.

Ms. Edwards then came to J██ in the hallway and asked her what was wrong. J██ explained that she was not comfortable being in the assembly, and told Ms. Edwards that she did not agree with the LGBTQ+ community but that she respected those individuals. Ms. Edwards responded that the assembly was not "forcing their beliefs" on J██ but was simply informing students about the LGBTQ+ community. J██ repeated that she simply did not feel comfortable going back inside. Ms. Edwards then told J██ directly: "You don't have any other choice."

J██ re-entered the assembly under compulsion and spent the remaining period of the assembly in tears, deliberately averting her eyes from the imagery being displayed. When the assembly ended, J██ walked to class with her best friend, who comforted her while she continued to cry. J██ then attended her next two classes with tears in her eyes. Her distress was visible to classmates and teachers alike.

Neither J██ nor her parents received advance notice that the assembly would include LGBTQ+ content. The District had, in prior years at North Hill Elementary School, provided parents advance notice of similar content, allowing the ████ to make arrangements for J██ not to attend. No such notice was provided here. The █████ had no opportunity to opt J██ out.

2

## STATEMENT OF LAW

**I. The Free Speech and Free Exercise Clauses Prohibit the Government from Compelling Students to Attend Events/Presentations That Violate Their Religious Beliefs.**

It is settled constitutional law that the government may not compel individuals to affirm, listen to, or participate in expression that violates their sincerely held beliefs. *See W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) ("No official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein."). As the Supreme Court explained, the right to refrain from speaking and the right to refrain from being compelled to receive a message one finds objectionable are coextensive aspects of First Amendment liberty.

The Supreme Court has emphasized that "[f]reedom of association . . . plainly presupposes a freedom not to associate." *Janus v. AFSCME, Council 31*, 585 U.S. 878, 892 (2018) (quoting *Roberts* v. *United States Jaycees*, 468 U.S. 609, 623 (1984)). The core of the Supreme Court's constitutional analysis in cases involving compelled speech was that "[c]ompelling individuals to mouth support for views they find objectionable violates that cardinal constitutional command." *Id.* at 892. At the heart of the First Amendment is the bedrock principle that the Government may not compel "a person to speak its own preferred messages." *303 Creative LLC v. Elenis*, 600 U.S. 570, 586 (2023). "Governments must not be allowed to force persons to express a message contrary to their deepest convictions." *Nat'l Inst. of Family & Life Advocates v. Becerra*, 585 U.S. 755, 780 (2018) (Kennedy, J., concurring). This doctrine has been foundational since at least when the Supreme Court recognized and protected the rights of students in *Barnette*, 319 U.S. at 637, where the Supreme Court held that school boards cannot compel students to recite the Pledge of Allegiance, defending the right of public students to not be obligated to speak in contradiction to their conscience. *Barnette* is directly on point here.

The Supreme Court has settled that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Community Sch. Dist.*, 393 U.S. 503, 506 (1969). This protection runs in both directions: the First Amendment guards not only a student's right to express her faith, but also her right not to be compelled to receive, affirm, or sit through expression that conflicts with that faith. "The First Amendment protects the right of individuals to hold a point of view different from the majority and to refuse to foster, in the way New Hampshire commands, an idea they find morally objectionable." *Wooley v. Maynard*, 430 U.S. 705, 715 (1977).

The Free Exercise Clause further prohibits the government from burdening the sincere religious practice of its citizens through laws or policies that are not neutral and generally applicable. *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993). Here, compelling Ju███ over her express objection—to attend a presentation that directly contradicts her Christian beliefs about sexuality and gender constitutes a direct burden on her free exercise. The school's refusal to allow her to leave, combined with the teacher's explicit statement that she had "no other choice," makes the coercion plain.

3

Relevantly, the Supreme Court has recognized that government-sponsored content touching religion carries a heightened risk of unconstitutional coercion in the school context. *See Lee v. Weisman*, 505 U.S. 577, 592 (1992) ("What to most believers may seem nothing more than a reasonable request that the nonbeliever respect their religious practices, in a school context may appear to the nonbeliever or dissenter to be an attempt to employ the machinery of the State to enforce a religious orthodoxy."). The same coercive dynamic is present here: J██ faced school officials who used their institutional authority to override her religious conscience and compel her continued attendance.

*Barnette* is directly on point. The students in Barnette were compelled to stand, extend their arms, and recite the Pledge of Allegiance — conduct they found religiously objectionable. J██ was compelled to sit in an assembly, watch imagery, and absorb normative messaging about gender and sexuality that she found equally objectionable on religious grounds. A teacher then told her, in words, that she had no choice. The constitutional analysis is the same: the government used the coercive power of the school to override a student's religious conscience and enforce an orthodoxy. Barnette forbids exactly this.

## II. The District's Conduct Constitutes Viewpoint Discrimination.

While school officials may apply "reasonable regulation[s] [to] speech-connected activities in carefully restricted circumstances," they may not censor student expression unless the speech "impinge[s] upon the rights of others" or creates a material and substantial disruption to the school's ability to fulfill its educational goals. *Tinker,* 393 U.S. at 509, 513. The law is quite clear, however, that "undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." *Id.* at 508.

Within *Tinker*'s framework, students are free to express their religious views while at school. Such expression includes sharing a Bible or an invitation to an event that contains Bible verses or religious references with other students who are willing recipients of such a gift or invitation. It is well settled that religious speech is protected by the First Amendment and may not be singled out for disparate treatment. *See Good News Club v. Milford Cent. Dist.*, 533 U.S. 98 (2001); *Rosenberger v. Rector & Visitors of the Univ. of Va*, 515 U.S. 819 (1995); *Mergens,* 496 U.S. 226; *Widmar v. Vincent*, 454 U.S. 263, 269 (1981).

Viewpoint discrimination, treating speech less favorably because of the particular perspective it expresses, is among the most egregious forms of content-based restriction and is subject to strict scrutiny. *See Rosenberger*, 515 U.S. at 828 (noting that "the government may not regulate speech based on its substantive content or the message it conveys" and that "in the realm of private speech or expression, government regulation may not favor one speaker over another.").

The Inclusion Assembly, as conducted, illustrates this point sharply. The District affirmatively promoted LGBTQ+ content through mandatory assembly attendance and provided student speakers a school-sponsored platform to discuss their sexual identities and orientations. At the same time, the District has, as our prior legal demand letters show, prohibited J██ from quietly distributing Christian tracts that reflect a traditional religious view of these same topics. The District promotes one viewpoint on human sexuality and gender in a mandatory school-wide

4

forum, while suppressing the opposing religious viewpoint in student expression. That is textbook viewpoint discrimination.

**III. Under *Mahmoud v. Taylor*, the District Was Constitutionally Required to Provide Advance Notice and a Meaningful Opt-Out Opportunity.**

The Supreme Court's landmark decision in *Mahmoud v. Taylor*, 606 U.S. 522 (2025), decided just last year, is directly controlling here. In *Mahmoud*, the Court held that when a public school requires children to attend instruction that presents normative messages regarding gender and sexuality that substantially interfere with the religious development of the child, the Free Exercise Clause is burdened — and strict scrutiny applies — unless parents are afforded timely notice and a practical opportunity to excuse their children. The Court grounded this principle in *Wisconsin v. Yoder*, 406 U.S. 205 (1972), which established that any policy posing a very real threat of undermining the religious beliefs parents wish to instill in their children triggers heightened constitutional protection, even if the policy is neutral and generally applicable.

In *Mahmoud*, the Supreme Court held that public schools substantially burden parents' free exercise of religion when they compel children to participate in instruction that "poses 'a very real threat of undermining' the religious beliefs and practices that parents wish to instill in their children." *Id.* at 530 (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 218 (1972)). The Court further held that when such a burden exists, schools must provide advance notice and honor opt-out requests. *Id.*

The Fourteenth Amendment's Due Process clause likewise provides heightened protection against governmental interference, including the fundamental right to make decisions concerning the care, custody, and education of one's children. *Troxel v. Granville*, 530 U.S. 57 (2000) (citing *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) and *Stanley v. Illinois*, 405 U.S. 645 (1972)).

Subjecting children to instruction that runs counter to a parent's faith and morals burdens parental efforts to raise their children in accord with the values the parent wishes to instill in the child. A public school has no monopoly on the instruction of the young. *Pierce*, 286 U.S. 510. "Students may not be regarded as closed-circuit recipients of only that which the State chooses to communicate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511 (1969).

The facts here are stronger than those in *Mahmoud*. The parents in *Mahmoud* challenged *passive* classroom exposure to LGBTQ+-themed storybooks without an opt-out. Here, the District did not merely expose J███ to LGBTQ+ content — it *compelled* her physical presence in a school-wide assembly devoted to that content, refused to release her when she personally and explicitly invoked her discomfort, and affirmatively told her she had "no other choice." That is direct coercion, not mere incidental exposure. If a no-opt-out policy for storybooks fails strict scrutiny under *Mahmoud*, a no-opt-out policy for an hour-long mandatory assembly — enforced in real time against a student who expressly raised a religious objection — cannot survive it either.

The District's failure is compounded by two additional facts that set this case apart. First, the District provided no advance parental notice that the assembly would include discussion of sexual and gender identity and other LGBTQ+ content. Under *Mahmoud*, the constitutional obligation to accommodate religious objections begins with notice: parents cannot exercise a right

5

they do not know they have. Second, the District had itself previously provided such notice to the ██████ family when similar programming was offered at the elementary school level, and the ██████ availed themselves of that accommodation. The District's deliberate abandonment of that notice practice at the middle school level cannot be reconciled with *Mahmoud*'s requirements.

As you know, this is the third time the ACLJ has found it necessary to address the Highline Public Schools' treatment of J████ ██████ religious liberty. This pattern of conduct is not incidental. It reflects a District culture that does not take the religious liberty of its students seriously. The ACLJ calls upon the District to recognize the gravity of this recurring problem and to take concrete, structural steps to prevent its recurrence.

## DEMAND

The situation described herein is of serious importance, not just to Ju██ but to all students attending the School who are entitled to the full protection of their First Amendment liberties. As you are undoubtedly aware, the violation of an individual's constitutional rights, even for a moment, results in irreparable injury. *Elrod v. Burns,* 427 U.S. 347, 373 (1976).

Accordingly, the ACLJ demands that the District provide written assurances of the following, no later than June 25, 2026:

1.      That the District will **not** conduct mandatory assemblies covering content that students or parents find objectionable on religious grounds without providing advance written parental notice and a meaningful, non-stigmatizing opportunity to opt out;

2.      That the District will affirmatively instruct its staff that a student's expression of religious objection to assembly content is a legally cognizable basis for excusing the student, and that staff may not tell a student she has "no other choice" but to remain;

3.      That the District will take appropriate remedial steps to address the pattern of conduct described herein, including by providing appropriate guidance and training to staff on students' First Amendment rights.

We trust that the District will respond promptly and constructively. The ██████ remain willing to resolve these matters without litigation; however, the accumulating record of violations leaves them—and us—with diminishing confidence that voluntary compliance will be maintained absent binding assurances.

Thank you for your prompt attention to this important matter.

Sincerely,

Nathan Moelker**
Senior Associate Counsel

6

Christina Compagnone*
Senior Managing Counsel
**American Center for
Law & Justice**
201 Maryland Ave NE
Washington, DC 20002


ROMERO PARK P.S.

Justin D. Park


\* *Admitted to practice law in Virginia and the District of Columbia*
\*\* *Admitted in Virginia*

7

# Plaintiffs' Exhibit F



**Educational Resource and Administrative Center**

15675 Ambaum Boulevard Southwest
Burien, Washington 98166

**highlineschools.org**
**206.631.3001**

Nathan Moelker
American Center for Law & Justice
June 25, 2026
*Sent Via Email*

Mr. Moelker,

I am in receipt of your letter dated June 18, 2026, regarding J███ █████ and a recent assembly at Sylvester Middle School. As with the prior demand letters your organization has sent, the facts are not precisely how they are portrayed in your letter.

First, assemblies at Sylvester are not mandatory. Students who do not wish to participate, for any reason, are allowed to go to an alternate location for reading or quiet workspace time. This is a known process at Sylvester, and students can opt themselves out or attending. The school does not query why a student wishes to opt out as that is an option available to all for any reason.

All assemblies at Sylvester are student driven and planned by the school's 8th grade Leadership class. The inclusion assembly on May 29th was focused on aspects of individual identity, including mental health, disability, and LGBTQIA+. The presentation included information about identity (such as a definition) along with the identification of prominent figures in each area. Students also spoke (for example, one student spoke about how her disability impacts her life), but students did not, as you state, describe "in detail their sexual identities".
We have no knowledge of any interaction with staff informing anyone that J███ was leaving because she needed to use the bathroom. J███ may have indicated to staff that she needed to use the bathroom so that staff could unlock the doors, but it would be highly unusual for anyone to announce that, and the building administrator who was in the assembly does not have a recollection of that occurring.

You have also mischaracterized what staff talked to J███ about while she was upset. Staff reported to the building administration after the assembly that they noticed J███ was upset, and they talked to her about the content of the assembly. Staff reported that they analogized it to a lesson where students were being taught about different identities, but that no one was trying to change her beliefs.
Staff did not tell J███ that she had no other choice but to return to the assembly. As previously stated, every assembly has an identified space for students to be if they do not wish to attend the assembly. Staff know that practice, and they would have directed J███ to that space if she



**Educational Resource and Administrative Center**

15675 Ambaum Boulevard Southwest
Burien, Washington 98166

highlineschools.org
206.631.3001

indicated she did not wish to return. Instead, J███ chose to re-enter the assembly and remained there for the duration of the event.

Understanding that J███ and her family prefer not to participate in these types of activities, the school will make sure that assemblies are listed on the school's calendar next year. This will ensure that all families are aware of what is happening in the building and give families time to notify the school if they do not want their child to attend. However, as previously stated, a parent opt-out is not required—students can and do opt themselves out, and J███ could have exercised that ability either before the assembly started or as she became uncomfortable.

As to your specific demands:
1. The district does not conduct mandatory assemblies.
2. Our school year is over, but I will remind building administrators in the fall that students or parents can opt out of activities for religious reasons.
3. I have met with the Sylvester leadership team, and they are aware of students' First Amendment rights and will provide appropriate guidance to staff.

As I stated in my previous response to you, we encourage Mr. and Mrs. ████ to reach out to the school this fall to discuss their concerns and ensure that everyone is on the same page. School leadership will also reach out to the family in the fall to begin a dialogue.

Sincerely,

*Holly*

Holly Ferguson, Chief Policy & Strategy Officer

Cc:    Dr. Ivan Duran, Superintendent
Chad Kodama, Principal
Lori McEwen, Assistant Principal